Hon. AMASA COBB, CHIEF JUSTICE.
"    SAMUEL MAXWELL, }
"    M. B. REESE,     } JUDGES.

---

THE STATE OF NEBRASKA, EX REL. FRANK W. MATTOON, v. REPUBLICAN VALLEY RAILROAD CO.

1. **Railroads**: DELIVERY OF GOODS. The common law rule requiring common carriers, by land, to make personal delivery to the consignee, has been so far relaxed as regards railways, *from necessity*, as in most cases to substitute in place of personal delivery a delivery at the warehouse of the company. But this is upon the ground that a railway has no means of delivery beyond its own lines. *Vincent v. The Chicago and Alton Railroad Co.*, 49 Ill., 33.

2. ———: ———: WAREHOUSES AND DEPOTS MUST BE MAINTAINED. In consequence of such relaxation, and in consideration thereof, the correlative duty devolves upon railways as common carriers to furnish and maintain suitable warehouses or depots at all appropriate points on their lines for the receipt and discharge of passengers and freight.

3. ———: UNJUST DISCRIMINATION. The right to build and operate a railroad, and to charge and take tolls and fares, is a prerogative granted by the state. Public utility is the considera-

tion for such grant.    Although in the hands of a private corporation it is still a sovereign franchise, and must be used and treated as such, it must be held in trust for the general good. In the use of such franchise all citizens have an equal interest and equal rights, and all must, under the same circumstances, be treated alike, without unjust discrimination against any.

4.    ———: ———: MANDAMUS. The duty thus imposed growing out of and resting upon the principles of the common law, may be enforced in the absence of statutory requirements.

ORIGINAL application for mandamus.

*Burke & Prout*, for relators.

I.    Railroad corporations have their existence in this and other states only by virtue of an act of the legislature. These corporations are not created for the personal aggrandizement of the corporators, it is only upon the theory that their works will be of benefit to the people at large that their chartered rights are given them.   Special powers and privileges are granted to railroad corporations by the state as a portion of sovereignty, such as the exercise of the right of eminent domain.   The duty of government to establish and maintain highways, to facilitate public travel and transportation at public expense, has been recognized and discharged by all civilized governments from the earliest times.   In the progress of events it was found that this function of government could with safety and convenience be entrusted to private individuals associated together under grant from government, the corporation giving the public the right to use the highway built by it in consideration of the franchise received.  Among the instrumentalities to which have been delegated this function of government, railroads stand pre-eminent.   Indeed they have come to be a public necessity, open to the public use without discrimination.   The corporation upon payment of fare is under the same obligation to render the required service for the public that the state would be if railroads

were free and conducted by state authority. Nor does the ownership of railroads, whether it be in the state or a private corporation, affect the nature of their use, since in either case the functions to be exercised and the use to be subserved are public. While the law affords railroad corporations adequate and complete protection in the exercise of their chartered rights, it holds them to a strict performance of the public duties enjoined upon them, as a consideration for the rights and powers thus granted.

Railroad charters are contracts made by the legislature in behalf of every person interested in anything to be done under them. In consideration of this franchise they receive from the state, railroad corporations agree to perform certain duties toward the public. Being creatures of the law, they are entrusted with the exercise of sovereign powers to subserve public necessities and uses; and are bound to conduct their affairs in furtherance of the public objects of their creation. The duties enjoined upon the corporation are ministerial duties, to do and perform what the public convenience and necessity reasonably require. Railroads are public highways. Const., Art. 11, § 4. 2 Potter on Cor., §§ 471–478, and cases cited. *Railroad Com. v. P. & O. C. R. R.*, 63 Me., 280. *McDurfee v. R. R. Co.*, 52 N. H., 447. *Commonwealth v. Eastern R. R. Co.*, 103 Mass., 258. *State of Conn. v. New Haven & Northampton Co.*, 37 Ct., 153. *Id.*, 43 Ct., 353. *State of Conn. v. The Hartford & New Haven R. R. Co.*, 29 Ct., 538. *Rogers L. & M. Works v. Erie R. R. Co.*, 20 N. J. Eq., 385. *P. & R. I. R. R. v. Mining Co.*, 12 Am. L. R. (N. S.), 272. *People v. N. Y. & H. R. R. R. Co.*, 9 Eng. and Am. R. R. cases, 1. *Sanford v. R. R. Co.*, 24 Pa. St., 381. *McCoy v. C. I. St. L. & C. R. R.*, 13 Fed. Rept., 3. *Munn v. Illinois*, 94 U. S., 113. *Messenger et al. v. Pa. R. R. Co.*, 36 N. J. L., 407. *Id.*, 37 N. J. L., 531. *Leavenworth Co. v. Miller*, 7 Kans., 479. *C. & N. W. R. R. Co. v. People*, 56 Ill., 367. *Hallenbeck v. Hand*, 2 Neb., 411. *The*

*State v. S. C. & P. R. R. Co.*, 7 Neb., 357. *The State, ex rel. Webster, v. Neb. Telephone Co.*, 22 N. W. R., 237.

II.   The power of determining what the duties are that are owed by a railroad company to the public, as well as the enforcement of their performance, is vested in the appropriate tribunals of the state.   It is not within the discretion of the directors ultimately to determine what these public ministerial duties are, or the manner in which they are to be performed.   To hold so would be to concede to the directors the power to promote the private interests of the corporation by subverting the public objects to be subserved by the charter.   The power, both of determination and enforcement, is necessarily vested in the courts.   *Railroad Com. v. P. & O. C. R. R. Co.*, 63 Me., 280.   2 Potter on Cor., § 476.   *The State, ex rel. Webster, v. Neb. Telephone Co.*, 22 N. W. R., 237.   *Munn v. Illinois*, 94 U. S., 113.   *Commonwealth v. Easton R. R. Co.*, 103 Mass., 258.   *State v. Hartford & N. H. R. R. Co.*, 37 Ct., 153.   *B. & M. L. v. Brooks*, 60 Me., 569.   *State v. The H. & N. H. R. R. Co.*, 29 Ct., 538.   *State v. N. H. & Northampton Co.*, 43 Ct., 353.   *Allen v. Joy*, 60 Me., 124.   *People v. N. Y. & H. R. R. R. Co.*, 9 Eng. and Am. R. R. cases, 1.   *McCoy v. C. I. St. L. & C. R. R.*, 13 Fed. R., 3.   *C. & N. W. R. R. Co. v. People*, 56 Ill., 367.

III.   Railroad companies in accepting their franchises accept them with all the advantages and disadvantages incident thereto.   They know, or should know, before undertaking their work, all that they will be obliged to contend with, and the probable expense to be incurred, and they can not, after having assumed their part of the contract made with the state, abandon or refuse to perform any part of the duty they owe to the public.   *R. R. Com. v. P. & O. C. R. R. Co.*, 63 Me., 269.   *C. & R. I. R. Co. v. Mining Co.*, 12 Am. L. J. (U.S.), 282.   *C. & N. W. R. R. Co. v. The People*, 56 Ill., 376.   1 Redfield on Railways, 683, § 3.   Id., § 6 and cases cited.   *The People, ex*

*rel.*, *v. N. Y. & H. R. R. R. Co.*, 9 Eng. & Am. R. R. cases, 1.  *State v. S. C. & P. R. R.*, 7 Neb., 374.  *State v. N. H. & Northampton Co.*, 37 Ct., 153.  *Atty. Gen. v. Erie & K. R. Co.*, 20 N. W. Rept., 730.

IV.  The withholding of such facilities from Blue Springs which are given to all other places on respondent's road is an illegal discrimination.  Comp. Stat., 385, Art. V., §§ 1-4.  *C. & N. W. Ry. Co. v. People*, 56 Ill., 365.  *Sanford v. Railroad Co.*, 24 Penn., 382.  *Rogers L. & M. Works v. Erie R. R. Co.*, 20 N. J. Eq., 385.  *Messenger et al. v. Pa. R. R. Co.*, 7 Vroom., 410.  *Boxendale v. G. W. Ry. Co.*, 5 C. B. (N. S.), 309.  *Vincent v. C. & A.*, 49 Ill., 33.  *Sanford v. R. R. Co.*, 24 Pa. St., 381.  *N. Eng. Exp. Co. v. Me. Cent. R. Co.*, 57 Me., 188.  *McDurfee v. R. R. Co.*, 52 N. H., 430.  *Cumblass v. R. & R. R. R. Co.*, 4 Brews., 613.  *Railroad Com. v. P. & O. C. R. R.*, 63 Me., 280.  *Hays v. Pa. Co.*, 12 Fed. Rept., 309.  *P. & R. I. R. R. v. Mining Co.*, 12 Am. L. R. (N. S.), 272.  *State, ex rel. Webster, v. Neb. Telephone Co.*, 22 N. W. Rep., 237.

V.  That it is a duty owed by railroad companies to the public to stop their trains, establish depots, furnish side tracks, etc., for the proper transaction of business, at all places upon their road and as frequently as will furnish reasonable accommodation to the public, is not only shown by the very nature of their office as common carriers, and by the declaratory words of our constitution making them public highways and declaring that " their liability as common carriers shall not be limited," but is it not also clearly expressed by an act of our legislature?  Comp. Statutes, Ch. 16, § 121.

Is the language of this statute to be misunderstood when it says railroad corporations " shall furnish sufficient accommodations for the transportation of passengers and freight," or can there be any mistake as to the meaning of the words, " shall take, transport, and discharge all passen-

gers to and from    *   *   *    all places   *   *   *    upon their said road?"

Is not the language of this section of our statutes abundantly comprehensive to cover the case at bar, and if enforced will it not give the relief asked for?

*Marquett & Deweese,* for respondent.

1.   Railroad has a right to establish its depots and stations, and has the right to determine where they shall be. Comp. Stat., Ch. 16, §§ 81, 121.   *A., T. & S. F. R. R. v. Denver,* 110 U. S., 667.

2.   The question is a legislative one, not judicial, as to whether the company should establish a depot at Blue Springs or not.   Cases cited *supra. Commonwealth v. Eastern R. R.,* 103 Mass., 258.   *State v. New Haven R. R.,* 43 Conn., 353.

3.   Authorities cited by relator have reference to where a railroad company abandoned a portion of the line or abandoned a depot once established.

4.   The court has no jurisdiction.   *Hall v. Chesapeake R. R.,* 12 Amer. & Eng. R. R. Cases, 41.   1 Rorer on Railroads, 20.   *Blanchard v. R. R. Company,* 31 Mich., 43.   *Marble v. Ripley,* 10 Wall., 339.   *Bagley v. Railroad,* 2 Phila., 44.

COBB, CH. J.

This is an original application to this court for a writ of mandamus requiring the respondent, the Republican Valley Railroad Company, to build within the corporate limits of the city of Blue Springs a depot, and to lay down the necessary side tracks and switches, and to stop its trains thereat for the proper transaction of business.   The relator alleges that that part of respondent's railroad which runs from Beatrice in a south-easterly direction to a point in section 29, township 2, range 7 east, where it intersects the

respondent's main, or east and west, line, was built in the years 1880–1; that it was built and runs through the said city of Blue Springs; that at the time of the construction of said railroad Blue Springs was a village of one thousand inhabitants; that it contained five stores carrying general stocks of merchandise, two stores carrying stocks. of hardware, two lumber yards, four implement houses, one pump and wind-mill house, three blacksmith shops, three drug stores, two hotels, two livery stables, two harness shops, two barber shops, two restaurants, two millinery shops, two printing offices, three land agents, one bank, with an average deposit of $50,000, two coal dealers, two butcher shops, one auction house, two saloons, one bakery, one jewelry store, three wagon shops, eight contractors and builders, two stock buyers, one grain dealer, one grist mill, one plow factory, one school with three departments, with a proportionate number of ministers, lawyers, and doctors.

The relator also alleges that at the time of filing the said relation, the said Blue Springs was a city of the second class of over fifteen hundred inhabitants, with a thickly settled country contiguous thereto, and to and from which large numbers of people desired to be carried by the respondent company, and to and from which large amounts of freight, produce, stock, and merchandise are annually consigned by way of the respondent's line of road; but that. the respondent has neglected, failed, and refused to establish or erect any depot or station house at said Blue Springs, or to stop all or any of its trains thereat for the receipt or discharge of either passengers or freight upon or from its. said railroad.

The relator further alleges that he is engaged in the business of buying grain and selling agricultural implements and farm machinery at said Blue Springs, and that in the carrying on of his said business he has large amounts of grain to ship from said point, annually, and has consigned to him large quantities of freight; that by the refusal of

the respondent to receive and discharge said freight at said Blue Springs, he is prevented from enjoying the same privileges and accommodations over the defendant's line of road as are merchants at other points on said line of railroad, etc. There are other allegations in said relation which it is not deemed necessary to notice in order to an understanding of the points decided by the court.

The respondent by its answer denies that it built its line of railroad through the village of Blue Springs, and alleges that said line of road, as located and built, was a distance from the corporate limits of said village of $988\frac{60}{100}$ feet, and that the depot built at Wymore is only $5,479\frac{1}{4}$ feet from the corporate limits of said village of Blue Springs; denies that there is any necessity for the location of a depot building nearer to Blue Springs than the location at Wymore, and alleges that it is impracticable for respondent to have and operate its line with a depot at both places, etc. Also that the Omaha & Republican Valley Railroad runs through Blue Springs and has established a depot there for the accommodation of the public, " and that they have no depot at Wymore." And also that the city of Wymore has now ......... inhabitants, and is far more important as a commercial point than Blue Springs, having and doing a great deal more business than Blue Springs.

A considerable part of the respondent's answer, as well as of its evidence, is directed to the point of the impracticability for topographical and engineering reasons of running its main or east and west line through Blue Springs. That proposition is not controverted or denied by the relator, nor do I see its relevancy to the case as presented by the relation. It may be admitted that so far as the main line is concerned, the respondent ownes no duty to the relator.

So far then as the case is presented by the pleadings, it involves these two questions:

1, Is the depot of respondent at Wymore sufficiently near to the business portion of Blue Springs as to afford

her inhabitants and merchants, and particularly the relator, all the facilities and accommodations which the respondent owes them as a common carrier, one of whose lines runs through the last named city, without discrimination against the business and inhabitants thereof? If not, 2, Is it practicable to operate respondent's branch line of railroad between Wymore and Beatrice with depots and regular services thereat, both at Wymore and Blue Springs?

The more important and *quasi* public question of the power of the courts in the absence of legislation to compel the respondent to establish and maintain a depot at Blue Springs, is raised by respondent in its brief, and that question will be first considered.

Relator in his brief contends that the legislature of the state has imposed upon the respondent the duty of furnishing side tracks and depots, and stopping its trains for the receipt and discharge of passengers and freight, and the proper transaction of business at all places upon their road, etc., and he cites section 121, of chapter 16, Comp. Stat., in support of that proposition. The section reads as follows: "Sec. 121. Every such railroad corporation shall start and run their cars for the transportation of passengers and property at regular times to be fixed by public notice, and shall furnish sufficient accommodations for the transportation of passengers and freight, and shall take, transport, and discharge all passengers to and from such stations as the trains stop at, from or to all places and stations upon their said road, on the due payment of fare or freight bill."

I do not think that this section furnishes authority for the interference of the courts to compel the establishment of a depot or station at any point on the line of respondent's road, but on the contrary, it is quite apparent upon the face of the section that every duty thereby imposed is qualified by the words, "to and from such stations as the trains stop at," and its application limited to established depots.

But in the opinion of this court it has authority to grant

relief in cases such as that presented in this case, yet for the source of its authority it must look to the principles of the common law rather than to legislative enactments. The respondent is a common carrier of persons and merchandise. At common law it was the duty of a common carrier by land to deliver freight personally to the consignee; but when railways took the place of conveyances drawn by animals, necessity required the relaxation of this rule so as to allow of the substitution in place of personal delivery a delivery at the warehouse or depot provided by the companies for the storage of goods. *Vincent et al. v. C. & A. R. R. Co.*, 49 Ill., 33. Is it too much to say that this relaxation of the above rule in favor of railway companies as common carriers imposed upon them the duty of providing suitable depots for the purpose of such delivery? This duty is so intimately connected with the business for which railways are built and managed that motives of self-interest almost always secure its observance. But when for any reason it is neglected or refused, may it not be enforced the same as any other public duty?

In the leading case of *Munn v. Illinois*, 94 U. S., 113. in the opinion, C. J. Waite, after showing by elaborate reasoning and the citation of authorities that " when private property is devoted to public use it is subject to public regulations," etc., says : " It is insisted, however, that the owner of property is entitled to a reasonable compensation for its use, even though it be clothed with a public interest, and that what is reasonable is a judicial and not a legislative question. As has already been shown, the practice is otherwise. In countries where the common law prevails, it has been customary from time immemorial for the legislature to declare what shall be a reasonable compensation under such circumstances; or, perhaps more properly speaking, to fix a maximum beyond which any charge made would be unreasonable. Undoubtedly, in mere private contracts relating to matters in which the public has no interest, what

is reasonable must be ascertained judicially. But this is because the legislature has no control over such a contract. So, too, in matters which do affect the public interest, and as to which legislative control may be exercised; if there are no statutory regulations upon the subject, the courts must determine what is reasonable. The controlling fact is the power to regulate at all. If that exists, the right to establish the maximum of charge as one of the means of regulation is implied. In fact, the common law rule, which requires the charge to be reasonable, is itself a regulation as to price. *   *   *   Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances. To limit the rate of charge for services rendered in a public employment, or for the use of property in which the public has an interest, is only changing a regulation which existed before. It establishes no new principle in the law, but only gives a new effect to an old one."

The question before that court was, whether the legislature of Illinois, under the limitations upon the legislative power of the state imposed by the constitution of the United States, had the power to fix by law the maximum of charges for the storage of grain in warehouses at Chicago, etc. And the object of the opinion is to uphold the legislature in the exercise of such power. But I think it equally sustains the proposition that, in the absence of all legislation, the abuse of overcharging by such warehousemen could be restrained and regulated by the courts; and that the same power extends to any other abuse in the management of property which has been impressed with a public interest, and which, by reason of its public use, has ceased to be *juris privati* only, as well as to that of fixing a maximum charge for its use.

This question can scarcely be said to be a new one in this court. In the case of *The State, ex rel. Webster, v. Nebraska Telephone Co., ante* p. 126, this court issued a

42

peremptory mandamus, compelling the respondent to place and maintain in the office of the relator a telephone and transmitter, such as are usually furnished to its subscribers. In the opinion by Judge REESE, he says: "Similar questions have arisen in, and have been frequently discussed and decided by, the courts, and no statute has been deemed necessary to aid the courts in holding that when a person or company undertake to supply a demand which is ' affected with a public interest,' it must supply all alike who are alike situated, and not discriminate in favor of nor against any." As a question of power, I fail to see any ground for distinguishing between that which compels a telephone company to furnish a separate instrument for the accommodation of one customer, and that which would compel a railroad company to make stoppage of its trains and furnish depot accommodations to a whole community. In neither case would any court interfere except where it is made to appear that such interference is necessary to prevent an unjust discrimination, or an abuse of that discretion which must be conceded to reside in all private corporations in respect to their dealings with the public.

The record in this case does not present the question of the power of the state to impose new duties upon railroad companies, or to take away or limit their powers by appropriate legislation. Nor does it present the question of the power of the courts to enforce the performance of every duty enjoined upon such corporations, either by the acts under which they derive their corporate existence or other legislation. If either of these questions were presented there would be abundant authority for their decision in the works and cases cited by counsel. But upon the precise point of the power of the court to enforce the discharge of a duty by the railroad company not specially enjoined upon it by the terms of its charter, nor any provision of statutory law, which, as above stated, I conceive to be the turning point in this case, there is but very little.

There are many opinions of courts and *dicta* in cases cited by counsel wherein the assumed right of railway corporations to discriminate between shippers and others is discussed, deprecated, and denied.    Such discrimination is in but few cases upheld, and then only when such discrimination is shown not to be unjust to the complaining party.    The remarks of Chief Justice Beasley, of the supreme court of New Jersey, in the case of *Messenger v. Pennsylvania R. R. Co.*, 36 N. J. L , 407, are so entirely in accord with the views of this court that I deem it not out of place to transcribe them here.    "A company of this kind is invested with  important prerogative franchises, among which are the rights to build and use a railway, and to charge and take tolls and fares.    These prerogatives are grants from the government, and  public utility is the consideration for them.    Although in the hands of a private corporation they are still sovereign franchises, and must be used and treated as such, they must be  held in trust for the general good.    If they had remained under the control of the state, it could not be pretended that in the exercise of them it would have been legitimate to favor one citizen at the expense of another.    If a state should build and operate a railroad, the exclusion of everything like favoritism with  respect to its use would seem to  be an obligation that could  not be disregarded, without violating natural equity and fundamental principles.    And it seems to me impossible to concede that when such rights as these are handed  over on  public considerations to a company of individuals, such  rights  lose their essential characteristics. I think  they are unalterably parts of the supreme authority, and in whatsoever hands they may be found they must be considered as such.    In the use of such franchises all citizens have an  equal  interest and equal rights, and all must, under the same circumstances, be treated alike.    It cannot be supposed that it was the legislative intention when such privileges were given that they were to be used

as private property at the discretion of the recipient, but, to the contrary of this, I think an implied condition attaches to such grants that they are to be held as a *quasi* public trust for the benefit, at least to a considerable degree, of the entire community.  In their very nature and constitution, as I view this question, these companies become, in certain aspects, public agents, and the consequence is they must in the exercise of their calling observe to all men a perfect impartiality."

While I frankly admit that I am able to find no case—certainly none has been cited by counsel—where the above principles have been applied to circumstances exactly like those of the case at bar, yet I am unable to distinguish it in principle from those in which it has been often applied, and we are, I think, unanimously of the opinion that they furnish us sufficient warrant for the exercise of the authority invoked.

As to the two questions presented by the record as above stated—1, Whether the depot of respondent at Wymore is sufficiently near to the business portion of Blue Springs as to afford the latter named place all the facilities and accommodations which the respondent owes to them, as a common carrier, etc.?  And if not, then, 2, Is it practicable to operate respondent's branch line of railroad between Wymore and Beatrice with depots and regular service thereat both at Wymore and Blue Springs?—we have, upon thorough examination of the evidence and consideration of the same, together with arguments thereon, as well at the bar as in the exhaustive printed briefs of counsel, found both of these questions for the relator.

A peremptory writ will therefore issue, substantially as prayed, with costs, etc.

JUDGMENT ACCORDINGLY.

THE other judges concur.