THE STATE OF NEBRASKA, EX REL. HENRY N. MOORE ET AL., V. CHICAGO, ST. PAUL, MINNEAPOLIS AND OMAHA R. R.

1.  **Mandamus:** DEMURRER. Where it is sought to test the sufficiency of a petition for a mandamus, the proper course is to demur to the petition upon the ground that the facts stated therein do not entitle the relator to the relief sought.

2.  ———: ———. Motion to quash for insufficiency, *Held*, To be a demurrer.

3.  ———: POWER OF RAILROAD COMMISSION. The act of the legislature creating the railway commission, which took effect June 6th, 1885, gives such commission general supervision of all railroads operated by steam in this state, and requires them, among other things, upon a proper complaint being filed, to investigate the necessity for any addition or change of station houses or stations. A party, therefore, who requires the change, addition, or erection of a station, must secure the action of the commission before this court will grant a mandamus to compel a location. The case of *State v. R. V. R. R. Co.*, 17 Neb., 647, was institute d before the act creating the railroad commission took effect.

ORIGINAL application for mandamus.

*Beeson & Sullivan,* for the relator.

*Charles Ogden,* for the respondent.

MAXWELL, CH. J.

This is an application for a mandamus to compel the defendant " to stop its trains, and to build a suitable depot, side tracks, switches, and cattle yards on its line of railroad at North Side, as shall reasonably accommodate the public, and conform to the requirements of the law," etc.   The relators allege in their petition, in substance, that said railroad was completed in May, 1882, that at that time said corporation established a station on the west half of section 8 in township 25, range 2 east, for the purpose of receiving and discharging freight and passengers; that in 1884 said defendant erected at said station cattle yards and a chute for loading and unloading live stock, and also erected " a large section house and put up posts one mile from said station on the line of said railroad," with boards attached thereto, on which was printed in large letters the words " one mile to station;" " that ever since the completion of said road until quite recently respondent has stopped all its trains, both freight and passenger, at said station, at regular times, for the purpose of receiving and discharging freight and passengers and placed the name thereof on its time tables and maps with regular times for the arrival and departure of its trains;" " that the nearest station is Hoskins on the west, seven miles, and Wayne on the east, fourteen miles;" " that the country in the vicinity of said station is open prairie, very fertile and adapted to agriculture, and at the time of the completion of said railway was very sparsely settled;" that since the completion of said railway, and because of the establishment of said station, the relator Moore " purchased eight hundred acres coming within one-fourth mile of said station, and has put it all under cultivation ;"

hat the relator Dodge purchased three hundred and twenty acres within one and a half miles thereof, and has

put it under cultivation and made it his permanent home; that "relator" Starr purchased one hundred and sixty acres within one mile thereof, and put it under cultivation and it is his permanent home, and about thirty other persons have also since the establishment of said station purchased and improved lands, and made permanent homes; that relators and said other citizens were induced to and did purchase and improve said lands and make their homes there, by the fact of the construction and operation of said railroad and the location of said station of North Side, and their belief that said station would be permanently maintained there; that at the time said station was located there were not to exceed twenty families located within a radius of seven miles thereof; that since the location of said station there have been established there, and are now in successful operation, a general store, a blacksmith shop, and lumber and coal yard, and a post-office, and a town has been laid off into lots, streets, and alleys, and the plat thereof duly recorded by the owners of the land; that from March, 1883, to about the first day of July, 1885, when said station was removed as hereinafter stated, there was shipped and unloaded at said station over respondent's railroad, in car load lots, about one hundred car loads of freight; during said time there was received and loaded at and shipped from said station about twenty-five car loads of freight, in car load lots, besides a large amount in quantities less than car load lots; but relators have no means of knowing or even approximating the amount; and large numbers of passengers arrived at and departed from said station over said road; but relators have no knowledge of the number of passengers thus carried over said road; that since the first of February, 1885, there has been shipped over said road for said town of North Side twenty-two car loads of lumber and other building material, and two car loads of coal; that during the time said station was maintained the business of said road to and from said sta-

tion was rapidly increasing, and if a station is continued there it will increase still more rapidly; that last spring the patrons of said station requested the respondent to erect a depot building at said station for the better accommodation of the shippers and passengers over said road; that respondent demanded as a condition of erecting a depot building or maintaining a station at North Side that a one-half interest in three hundred and twenty acres of land adjoining said station should be conveyed to them, and threatened that if their demands were not complied with that the station would be entirely removed, and trains would cease stopping there; that the owners of said land offered respondent a one-half interest in one hundred and sixty acres of said land as an inducement to erect a depot building and continue the station at North Side, but respondent refused to erect said depot building, or to continue longer to maintain a station or stop its trains at North Side, unless its demands for a one-half interest in said land was complied with, and because of the refusal of the owners of said land, who are non-residents, to comply with said demands, respondent removed said depot, side tracks, and stock yards as hereinafter stated; that about the first of July, 1885, respondent not regarding its duties as a common carrier, nor the rights of the relators and the public, and to avoid its duties as a common carrier, and for the reason that the owners of said land refused to donate land to them on which to lay out a town, respondent removed the side track, stock yards, and section house from North Side, and has ever since refused to receive or discharge freight at North Side, except in quantities less than car load lots, and is threatening to and soon will, if not prevented by order of this court, cease stopping any of its trains at said place; that since the removal of the depot from North Side respondent has put in a side track and stock yards and established a depot at a point on said railroad three and one-half miles east of North Side, and re-

moved the section house from North Side to said point, and stops its trains and delivers and receives freight there in any quantities desired. There is no settlement or improved land nearer than five miles to the north or south of said new station, and the nearest house on the east is at least three miles distant, and only two houses between it and North Side on the west. There are only ten persons who will be as well accommodated with a depot at the new place as at North Side, and five of them are as convenient to North Side as to the new station. There is no business of any kind established at the new station, but respondent is making strong efforts to induce the parties who are doing business at North Side to move to said new place, by offering to move their goods and buildings free of charge, and to indemnify them against loss by the removal. Respondent is also endeavoring to procure the removal of the post-office from North Side to said new station. The relators further state that there are large amounts of freight that must be shipped over respondent's railroad for relators and other residents and citizens of North Side and vicinity; that relator Moore now has about four hundred head of cattle, and about five hundred head of hogs, and about twenty-five thousand bushels of corn, all of which he desires to ship to market over respondent's railroad, and relators Dodge and Starr also have large amounts of stock and grain to ship over said road, as have all the other citizens at and in the vicinity of North Side, and it is essential to the business of the relators and other citizens that large quantities of freight should be shipped to said station, such as lumber, lime, coal, agricultural implements, dry goods, groceries, household goods, stock, and a great many other things that are essential to every community; that prior to the commencement of this action the relators and other parties equally interested requested respondent to put in a side track and give the necessary and proper facilities for doing business over said road at North Side, which re-

spondent utterly refuses to do; that by reason of the re-
moval of said station, and the refusal of respondent to
receive or discharge freight at North Side, relators and a
large number of other persons are prevented from enjoy-
ing the same privileges and accommodations over respond-
ent's railroad as are persons at other points on the line of said
railroad, who are engaged in the same business, whereby
they will be put to great expense and inconvenience in the
transaction of their business; that men of capital have
since said town was laid out at North Side come there for
the purpose of investing money and going into business,
but on learning that the depot was about to be taken away
and trains to cease stopping there, they abandoned the idea
and declined to invest money there; that the trade, com-
mercial, and agricultural interests of that portion of the
country that would be better accommodated at North Side
than at any other station on said road are sufficient to sup-
port a town of three or four hundred inhabitants; that
at the new station there is no depot building, nor other
place to store goods for shipment over said road, nor any
one there to look after or care for goods shipped to or from
said station; that by reason of a depot being located as
aforesaid at North Side, they and about thirty other per-
sons, who purchased land in the vicinity thereof, were
compelled to and did pay a higher price for their land than
they could have bought as good land for as near the line of
said railroad where there was no depot, and that if said depot
is not re-established their land will be diminished in value
in consequence thereof from three to five dollars per acre.

"Relators allege that the respondent, in the proper exer-
cise of its franchises, is bound to so conduct its business as
to accommodate the public along the line of its road, and
to that end to stop its train of cars for the receipt and dis-
charge of passengers and freight, and to build the neces-
sary depots, switches, side tracks, and stock yards for the
accommodation of business at centers of trade and popu-

lation through which its line of road passes, and that by reason of respondent's refusal to establish a depot and to stop its trains at North Side, and by establishing a depot and stopping its trains at said new station, respondent is discriminating against North Side and in favor of said new station.    Relators further state that about nine-tenths of the freight shipped to and from the new station is shipped by or to the patrons of North Side, and has to be transported the three and one-half miles by wagon at a great increase of cost and inconvenience; that they, together with others equally interested in the matter, applied by petition to the board of railroad commissioners for relief in the premises; but said board neglects and refuses to grant any relief or to take any action whatever in the matter."

The defendant now moves to quash the petition upon a number of grounds, which in effect are, that the petition does not state facts sufficient to entitle the relators to the relief sought.    The proper practice in such case is not to quash the petition or affidavit on which the writ is sought, but to demur for some of the causes stated in the code. *Long v. State*, 17 Neb., 60–68.    Mandamus is not a pre-rogative writ in this state, but a remedy given to the citizen to enable him to assert his rights and obtain justice. *State v. Lancaster County*, 13 Neb., 223.    *Com. v. Dennison*, 24 How., 97.    High on Ex. Rem., § 3.    Maxw. Pl. and Pr. (4th ed.), 729.    Hence the ordinary rules of pleading, where there are no special provisions of the statute to the contrary, apply to proceedings by mandamus.    The motion in this case, however, will be treated as a demurrer, that the facts stated in the petition do not entitle the relators to the relief sought.

At the last session of the legislature an act was passed "to provide a board of railroad commissioners, to define their duties, and to provide for their salaries," etc.    Comp. Stat., chap. 72, art. VIII.    Sec. 2 of the act provides that, "said commissioners shall have the general supervision of

all railroads operated by steam in this state, and shall in-
quire into any neglect or violation of the laws of this
state by any railroad corporation doing business therein,
or by the officers, agents, or employes thereof; and shall
also from time to time carefully examine and inspect the
condition of each road in the state, and equipments, and
the manner of its conduct and management with refer-
ence to the public safety, interest, and conveniences. When-
ever in the opinion of the railroad commissioners it shall
appear that any railroad corporation fails in any respect
or particular to comply with the terms of its charter or
the laws of this state, or whenever in their judgment any
repairs are necessary upon its road, or any addition to its
rolling stock, or any addition or *change of its station
houses or stations*, or any change in mode of operating its
road or conducting its business is reasonable and expedient
in order to promote the security, convenience, and accom-
modation of the public, said railroad commissioners shall
inform said railroad corporation of the improvements and
changes which they adjudge to be proper, by notice in
writing, to be served by leaving a copy thereof, properly
certified, with any station agent, treasurer, superintendent,
or director of said corporation, and a report of such pro-
ceedings shall be included in the annual report of the
commissioners to the governor, who shall transmit the same
to the legislature. Nothing in this section shall be construed
as relieving any railroad corporation from its present respon-
sibilities or liabilities for damage to person or property."

It will be observed that the statute gives the board
"general supervision of all railroads operated by steam in
this state," and provides that when "any addition or change
of its station houses or stations" * * in order to pro-
mote "the security, convenience, and accommodation of
the public," are required, the board shall serve a notice in
writing on the corporation of the improvements and
changes *which they adjudge to be proper*, etc. Here is a

plain and apparently an adequate remedy at law that did not exist when the case of *State v. Republican Valley R. R. Co.*, 17 Neb., 647, was instituted.

The 10th section of the act provides in effect that a complaint under oath shall be made to the board, setting forth the grievance complained of. Thereupon, if the board upon investigation shall believe that there is probable cause for such complaint they shall notify the corporation of the matter of which complaint is made and suggest what action should be taken in the premises. These provisions, in connection with section 75 of chap. 16 of the Comp. Statutes, empowering the corporation to establish such offices and depots as may be *necessary* between the places of termini of the road, would seem to place the location and change of stations very largely under the control of the board. Here is a special tribunal created for the very purpose of exercising jurisdiction in such cases, and its powers must be exhausted before this court would be justified in interfering. If, when a proper petition is presented to the board requesting it to act on any matter of which it has cognizance, and it refuses to take action thereon, this court, upon the proper application, will require it to proceed and determine the matter in controversy. The allegations in the petition as to the complaint presented to the board are entirely insufficient to show that it was the duty of the board to act on such complaint. If a proper complaint is presented to such board there is but little doubt that it will take the necessary steps to investigate the case, but if it should fail to do so, the court on a proper application will compel it to act.

As the petition fails to show that the relators are entitled to the relief sought at the hands of this court the writ must be denied.

WRIT DENIED.

THE other judges concur.