STATE OF NEBRASKA, APPELLEE, v. MISSOURI PACIFIC RAIL-
WAY COMPANY, APPELLANT.*

FILED MARCH 5, 1908.   No. 15,122.

1. Commerce: RAILROADS: REGULATION.   While interstate commerce and the instrumentalities by which it is carried on is within the exclusive control of the federal congress, the domestic commerce of a state and the facilities by which it is conducted is within the control of the state, and the legislature of the state may make such reasonable rules and regulations governing its domestic commerce and the instrumentalities by which it is conducted as seem best fitted to advance the interest and convenience of its citizens, provided such regulation does not directly burden or interfere with the interstate commerce of the nation.

2. ————: INTERSTATE.   Produce does not become a matter of interstate commerce until delivered to the carrier to be transported out of the state to the state of its destination, or has started on its ultimate transportation to that state.

3. Constitutional Law.   Section 1, ch. 105, laws 1905, is not subject to the objection of being special or class legislation.

4. ————.   This law referred to in the last preceding paragraph of this syllabus is not objectionable as allowing the taking or damaging of private property without just compensation, or as depriving the citizen of his property without due process of law.

APPEAL from the district court for Cass county: PAUL JESSEN, JUDGE.  *Affirmed.*

*James W. Orr, A. N. Sullivan* and *B. P. Waggener,* for appellant.

*C. A. Rawls, contra.*

DUFFIE, C.

The legislature of 1905 passed an act which contains, among others, the following provisions:

* Pending on error in supreme court of United States.

"Section 1. Every railroad corporation shall give to all persons and associations reasonable and equal terms for the transportation of any merchandise or other property of every kind and description upon any railroad owned or operated by such corporation within this state, and for terminal handling, the use of the depot and other buildings and grounds of such corporation, and at any point where its railroad shall connect with any other railroad, reasonable and equal terms and facilities of interchange, and shall promptly forward merchandise consigned or directed to be sent over another road connecting with its road, according to the directions therein or accompanying the same; and every railroad company or corporation operating a railroad in the state of Nebraska shall afford equal facilities to all persons or associations who desire to erect or operate, or who are engaged in operating grain elevators, or in handling or shipping grain at or contiguous to any station of its road, and where an application has been made in writing for a location or site for the building or construction of an elevator or elevators on the railroad right of way and the same not having been granted within a limit of sixty days, the said railroad company to whom application has been made shall erect, equip, and maintain a side-track or switch of suitable length to approach as near as four feet of the outer edge of their right of way when necessary, and in all cases to approach as near as necessary to approach an elevator that may be erected by the applicant or applicants adjacent to their right of way for the purpose of loading grain into cars from said elevator, and for handling and shipping grain to all persons or associations so erecting or operating such elevators, or handling and shipping grain, without favoritism or discrimination in any respect whatever: Provided, however, that any elevator hereafter constructed, in order to receive the benefits of this act, must have a capacity of not less than fifteen thousand bushels.

"Section 6. Any railroad company, officer or agent thereof who wilfully violates or evades any of the pro-

visions of this act shall be liable to the party injured for all damages sustained by reason of such violation, and, in addition thereto, shall be liable for each offense to a penalty of five hundred dollars ($500), which may be recovered by the county attorney in an action brought in the name of the state of Nebraska in any county by an action in the district court where such railroad company or corporation is doing business."

This act is known as chapter 105 of the session laws of 1905. The facts leading up to this legislation are so well known that judicial notice thereof may be taken. Whether well-founded or not, the public at large had come to believe that a combination existed between the grain dealers and owners of elevators within this state to control the price of grain, and as a result that the producer was compelled to sell at a price much below the market value of his product. In this condition of affairs, the legislature enacted the statute above set out, and many of the farmers throughout the state organized companies for the purpose of erecting and maintaining elevators at the railway stations most convenient to their homes. In 1905 the Manley Cooperative Grain Association was organized, and in October of that year applied to the manager of the Missouri Pacific Railway Company for a lease to grounds on the right of way of the Missouri Pacific in Manley, Nebraska; the ground to be used as a building site for a grain elevator. On October 28 defendant's superintendent replied to this application as follows: "In reply to your favor of the 23d inst., beg to advise that we already have a sufficient number of elevators located on our right of way at Manley to take care of all the business originating at that station, and we cannot, therefore, grant your application." On November 8, 1905, the association again wrote the officers of the company, stating that it had control of a tract of land adjacent to the railroad right of way and near the south end of a side-track on the road. It was further stated

that the association proposed to construct an elevator on this land, having a capacity of at least 15,000 bushels, and when constructed it would expect the company to comply with the laws of Nebraska and to extend its side-track so that grain could be loaded from the elevator into cars on such extended side-track. The letter further stated that the association was made up of representative and substantial farmers residing in and about Manley, who during the last year had shipped about 50,000 bushels of grain over defendant company's road; that the members of the association had ample capital to construct and operate the elevator, and wished to do business with defendant company; that there was ample room on the right of way adjacent to defendant's side-track where, if permitted, they would construct their elevator, and obviate the necessity of building on their own land and causing the expense of extending the side-track; that, while they did not know what such expense might be, they were willing to bear an equitable share of the cost if the defendant company would either construct the same forthwith or contract to do so when it was needed. The letter concluded with an inquiry whether the company would consider any proposition looking toward the extension of its switch further south as above indicated and offering to give a bond to construct the elevator. In reply the superintendent of the company, under date of November 22, stated that there was no change in the position of the company. His letter concluded as follows: "We will not lease you a portion of our ground upon which to erect an elevator, nor will we give you trackage privilege to load from such a structure if erected on your individual property."

On January 12, 1906, the grain association notified the company, in writing, that it had about completed the construction of its elevator, which had a capacity of more than 15,000 bushels; that they had about 100,000 bushels of corn in sight for the elevator; that the building was so situated that the present side-track could be extended

in nearly a straight line, and if built in that direction and within four feet of the edge of the right of way would permit the switching of cars to be loaded for shipment. It was further stated that during the last season the association had shipped about 50,000 bushels of corn from the station at Manley and had been compelled to load it into cars on the side-track; that their elevator would permit the more economical and speedy handling of the grain; that they expected to continue in business at Manley for an indefinite time; that they were still willing to bear an equitable share of the expense in extending the siding, and now again demanded the extension of the side-track to the elevator so that the side-track would be laid within four feet of the outer line of the company's right of way. The defendant company still refused to comply with the demand of the grain association to extend its track. Thereafter this action was brought in the district court for Cass county to recover the penalty of $500 provided by statute for such refusal. On the trial judgment went in favor of the state, and defendant has appealed to this court.

The defenses urged against the maintenance of the action are, briefly stated, the following: First, That the subject matter of the action is within the exclusive jurisdiction of the United States and subject only to the control of congress; and, congress having acted in the passage of the act to regulate commerce, approved June 29, 1906, the state court is deprived of all jurisdiction of the subject matter of the action, the defendant road being an interstate road, and the claim being that the grain to be handled in the elevator in question was intended for interstate shipment. Second. That the statute under which the action is brought is invalid, because it is special and class legislation, and repugnant to section 15, art. III of the constitution of the state of Nebraska, which prohibits special legislation. Third. That the statute under which the action is brought provides for taking and damaging the property of appellant without just

compensation, and is therefore violative of section 21, art. I of the constitution of the state. Fourth. That the statute under which the action is brought seeks to deprive appellant of its property without due process of law and is repugnant to the fourteenth amendment to the constitution of the United States.

While each of the foregoing defenses are insisted on, defendant has chiefly devoted his argument to the one first mentioned, insisting that as the road of defendant company is an interstate road, chartered by the state of Missouri, and having a continuous line extending through six or seven states of the Union, its track and appurtenance is exclusively under federal control, and not subject to state regulation or the jurisdiction of the state courts. On the oral argument it was conceded by the attorneys representing the defendant that, so far as the domestic commerce of the state is concerned, it is subject to state control and regulation, and with this concession freely given it is hard to see why the sovereign state, which may control its own domestic commerce, shall not have a voice in determining the facilities by which that commerce is to be conducted. That purely internal commerce of a state is exclusively under state regulation has been many times determined by the supreme court of the United States. *Moore v. American Transportation Co.,* 24 How. (U. S.) 1; *Walker v. Western Transportation Co.,* 3 Wall. (U. S.) 152; *The Daniel Ball,* 10 Wall. (U. S.) 557. In the case last cited it is said: "The limitation of the power of congress over commerce to commerce among the several states, with foreign nations, and with the Indian tribes, necessarily excludes from federal control all that commerce which is carried on entirely within the limits of the state, and does not extend to or affect other states."

While defendant concedes that this is the rule, argument of counsel is partially based upon the theory that the grain which this elevator purposes to receive is intended for shipment to markets in other states, and,

further, that the act to regulate commerce, approved June 29, 1906, commonly known as the "Hepburn bill," places all interstate railroads, including switches, spurs, tracks and terminal facilities of every kind used or necessary in the transportation of the person or property designated therein, and all freight depots, yards, and grounds used or necessary in the transportation or delivery of any of said property, and all instrumentalities and facilities of shipment or carriage, under charge and control of the interstate commerce commission. So far as the road is engaged in interstate commerce, it cannot be denied that every appurtenance of the road is within the control of the interstate commerce commission; but this does not in the least interfere with state control of the road and its appurtenances, so far as it is engaged in intrastate commerce. As said by the supreme court of Iowa in *McGuire v. Chicago, B. & Q. R. Co.*, 131 Ia. 340: "Subject alone to the condition that the regulation imposed does not operate upon interstate commerce or otherwise violate the provisions of the federal constitution, the power of the state to prescribe the terms on which foreign corporations may do business within its jurisdiction is unlimited. The fact that the corporation is engaged in interstate commerce does not exempt it from control by the state in respect to all business done therein not directly connected with traffic between the states. For instance, the local statutes pertaining to the duty to fence railway tracks, imposing liability for live stock killed by moving trains or for damages by fire set out by engines, regulating speed of trains within city or yard limits, abolishing the fellow-servant rule, requiring the redemption of unused tickets, and regulating contracts of employment, are no less applicable to foreign corporations engaged in interstate commerce than to domestic corporations doing only a local business."

Again, it might be said that the defendant company, by entering this state, subjected itself to all our laws relating to the control and management of railways. Sec-

tion 121, ch. 16, Comp. St. 1907, has been in force since 1864. It is as follows: "Every such railroad corporation shall start and run their cars for the transportation of passengers and property at regular times, to be fixed by public notice, and shall furnish sufficient accommodation for the transportation of passengers and· freight, and shall take, transport, and discharge all passengers to and from such stations as the trains stop at, from or to all places and stations upon their said road, on the due payment of fare or freight bill." In *State v. Republican V. R. Co.*, 17 Neb. 647, a case in which this court issued a mandamus to compel the erection of a depot, basing its action on the rule of the common law requiring carriers to furnish adequate facilities to the public, it was said, referring to the section above quoted: "I do not think that this section furnishes authority for the interference of the courts to compel the establishment of a depot or station at any point on the line of respondent's road, but, on the contrary, it is quite apparent upon the face of the section that every duty thereby imposed is qualified by the words 'to and from such stations as the trains stop at,' and its application limited to established depots." On rehearing, granted on the application of the railway company, the court, while not intimating any doubt of the correctness of its former opinion, held that under our constitution and the several sections of our general railway act, and particularly of section 75 thereof, all railway companies in the state were required to furnish such "side-tracks, turnouts, offices, and depots as *shall be necessary*," so that by our former decisions railway companies in this state are required, both under the rule of the common law and by force of our statute, to furnish such side-track, depots, etc., as may be necessary for the use of the public. See 18 Neb. 512.

It may be that the elevator facilities furnished by the two elevators erected and doing business prior to the building of the elevator in question would under proper management accommodate the trade at that station, but

State v. Missouri P. R. Co.

the condition of the market there, as shown by the evidence, did not afford the grain growers the fair market value of their product. The evidence is undisputed that the price of grain fixed by these elevators was from two to four cents below the fair market value of such grain, and we can conceive of no higher duty required of the defendant company than to furnish adequate facilities to the farming community that had expended its money in erecting an elevator for the storage and shipment of their own grain, in order to protect themselves against a condition which denied them the fair market price of their produce. If these facilities demanded the extension of the railroad switch at that station within reasonable limits, the power of the state to enforce its construction for the benefit of its citizens can no more be denied than the power possessed by the state to require the erection of a depot at a point where the interest and the convenience of the citizens demand it, even in the absence of the statute.

It is also urged that the grain received at the elevator in question was designed for shipment to a sister state, that it was an article of interstate commerce, and that application for facilities in the operation of the elevator should be addressed to the interstate commerce commission, and not to the courts of the state. The answer to this is that the record discloses that a great part of the grain received at this elevator was sold in Omaha; but, even if this were not the case, the authorities are uniform in holding that produce does not become a matter of interstate commerce until actually delivered to the carrier to be transported beyond the boundaries of the state. In *Coe v. Errol*, 116 U. S. 517, 525, the court deals with this question in the following words: "There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for trans-

portation from the state of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state." In the case of *In re Greene,* 52 Fed. 104, 113, it is said: "When the (interstate) commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state. * * * That neither the production or manufacture of articles or commodities which constitute subjects of commerce, and which are intended for trade and traffic with citizens of other states, nor the preparation for their transportation from the state where produced or manufactured, prior to the commencement of the actual transfer, or transmission thereof to another state, constitutes that interstate commerce which comes within the regulating power of congress." In concluding this branch of the discussion, we might say that we confess our inability to comprehend the force of the reasoning which concedes to the state the right to regulate and control its own commerce, acting at its pleasure in that regard, so long as it does not burden or impede interstate commerce, and which at the same time denies to it any voice in designating the instrumentalities by which that commerce is to be carried on and the facilities which the carrier shall afford the shipper.

We do not think the act under consideration is subject to the objection of special legislation urged against it by the defendant. In *Hunzinger v. State,* 39 Neb. 653, the

court said: "If the law is general in its terms, and restricted by its terms to no particular locality, and operates equally upon all of a group of objects, it is not a special law." In *Livingston Building & Loan Ass'n v. Drummond*, 49 Neb. 200, it was said: "It has been very often decided by this court that if a law is general and uniform throughout the state, operating alike upon all persons and localities of a class, or who are brought within the relations and circumstances provided for, it is not objectionable as wanting uniformity of operation, or as being in the nature of special legislation." To the same effect are *State v. Berka*, 20 Neb. 375; *State v. Graham*, 16 Neb. 74; *McClay v. City of Lincoln*, 32 Neb. 412; *State v. Robinson*, 35 Neb. 401; *Van Horn v. State*, 46 Neb. 62.

The third and fourth objections raised by the defendant may be considered together. The building of a side-track upon the defendant's right of way is not a taking of its property. The switch or side-track will be owned by the company and under its control. It remains a part of the line of defendant's railroad, and a part of the public highways of the state. The grain company will have no exclusive use of this side-track. As said in *Chicago, B. & Q. R. Co. v. Giffen*, 70 Neb. 66: "The proprietor of an elevator, built upon the right of way of a railroad company by permission of the company, is a licensee upon the premises, and must operate his elevator, loading cars therefrom, subject to the right of the company to handle its trains and use the track for switching purposes in the ordinary and usual way of doing such work." While the elevator in the case at bar is built upon the grounds owned or controlled by a grain association adjacent to the defendant's right of way, this will not at all change the rule relating to the use of the side-track. The company may still use the track for its own purposes, and will be under no further obligation to the elevator company than to furnish cars for the transaction of its business, giving it equal facilities with other like companies

upon said switch or upon its right of way. The case is
not similar to that of *Missouri P. R. Co. v. Nebraska,*
164 U. S. 403, where the supreme court of the United
States reversed the holding of this court requiring the
railway company to furnish a free site upon its right
of way for the building and maintenance of a grain ele-
vator. The opinion of this court was reversed upon the
sole ground that it required the railway company to grant
to the petitioners the right to build and maintain a per-
manent structure upon its own grounds without being
compensated therefor. In the opinion it is said: "Nor
does it (the record) present any question as to the power
of the legislature to compel the railroad company itself
to erect and maintain an elevator for the use of the public;
or to compel it to permit all persons equal facilities of
access from their own lands to its tracks * * * for
the purpose of shipping or receiving grain or other freight.
* * * The order in question was not limited to tempo-
rary use of tracks, nor to the conduct of the business of
the railway company. But it required the railway com-
pany to grant to the petitioners the right to build and
maintain a permanent structure upon its right of way."

That a railroad company may be compelled to construct
a switch for the accommodation of the public is recog-
nized in the provisions of the Hepburn law, as well as by
the decisions of the supreme court of the United States.
In the first section of the Hepburn act (U. S. St. at Large,
vol. 34, p. 585, ch. 3591, June 29, 1906) it is provided as
follows: "Any common carrier subject to the provisions
of this act, upon application of any lateral, branch line
of railroad, or of any shipper tendering interstate traffic
for transportation, shall construct, maintain, and operate
upon reasonable terms a switch connection with any such
lateral, branch line of railroad, or private side-track
which may be constructed to connect with its railroad,
where such connection is reasonably practicable and can
be put in with safety and will furnish sufficient business
to justify the construction and maintenance of the same;

and shall furnish cars for the movement of such traffic to the best of its ability without discrimination in favor of or against any such shipper." If the federal congress may make such provision for the benefit of interstate shippers, we can see no reason why the legislature of the state may not protect the domestic shipper by similar legislation. We can see no difference in principle in compelling a company to build a switch connection with another road and constructing a switch or side-track upon its own right of way for the accommodation and convenience of a domestic shipper.

A statute of the state of Minnesota contains a provision similar to that found in the Hepburn law, requiring a switch connection between two roads for the transfer of traffic, and in the case of *Jacobson v. Wisconsin, M. & P. R. Co.*, 71 Minn. 519, the validity of the statute was questioned upon the grounds here urged against the statute under consideration. The supreme court of Minnesota held: "Where the putting in of a connecting switch at the crossing of two railroads to facilitate the transfer of cars from one road to the other will benefit both state and interstate traffic, *held*, there is concurrent jurisdiction in the state and federal authorities to order the putting in of such connection." And upon appeal to the supreme court of the United States (179 U. S. 287), that court affirmed the opinion of the state court, and held as follows: "The providing, at the place of intersection of the two railroads affected by this case, ample facilities for transferring cars used in the regular business of the respective lines, and to provide facilities for conducting the business, while it would afford facilities to interstate commerce, would not regulate such commerce, within the meaning of the constitution. * * * Whether a judgment enforcing trade connections between two railroad corporations is a violation of the constitutional rights of either or both depends upon the facts surrounding the cases in regard to which the judgment was given." In the body of the opinion it is said: "Railroads have from

the very outset been regarded as public highways, and the right and the duty of the government to regulate in a reasonable and proper manner the conduct and business of railroad corporations have been founded upon that fact. Constituting public highways of a most important character, the function of proper regulation by the government springs from the fact that in relation to all highways the duty of regulation is governmental in its nature. At the present day there is no denial of these propositions. *Olcott v. Supervisors,* 16 Wall. (U. S.) 678; *Cherokee Nation v. Southern Kansas R. Co.,* 135 U. S. 641; *United States v. Joint-Traffic Ass'n,* 171 U. S. 505; *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285. It is because they are such highways that the land upon which the rails are laid, and also that which may be necessary for the other purposes of the corporation, is said to be used for a public purpose. * * * The companies hold a public franchise, and governmental supervision is therefore valid. They are organized for the public interests and to subserve primarily the public good and convenience." In *Atlantic Coast Line R. Co. v. North Carolina Corporation Commission,* 206 U. S. 1, 19, it is said: "The elementary proposition that railroads from the public nature of the business by them carried on and the interest which the public have in their operation are subject, as to their state business, to state regulation, which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfully questioned in view of the long line of authorities sustaining that doctrine."

The evidence taken upon the trial shows that the elevator in question, without any side-track facilities, and doing what is called a scoop-shovel business, shipped about 50,000 bushels of grain during the year prior to the trial of this action, and that with proper side-track facilities it will double, or more than double, its business. Not only is this the case, but the business of the railroad itself would be greatly facilitated by the building

of this side-track.   Now the grain has to be hauled from the elevator to the cars in wagons, and but two cars a day can be loaded.   With proper side-track facilities the same work can be done in from one to two hours—a saving of time and of expense to the shipper—thus clearing the railway track of cars that would otherwise necessarily incumber it for some days.   The expense of extending the side-track, as shown by the defendant's own evidence, will not exceed $450, while the revenue derived from the shipment of grain will, as otherwise shown, amount to, or exceed, $3,000 per annum.   Under the circumstances, we think that the demand for an extension of the side-track was reasonable, and that its construction will not cast an undue burden upon the defendant.   By such extension the convenience of the shipper will be greatly facilitated, and the interest of the farming community advanced.   At the same time the cars of the company will not be delayed in the loading and their use to other shippers denied during the time now necessarily employed in filling them for shipment.   The extended switch will neither impede nor burden interstate shipments; but it will facilitate such as may be made from this elevator and from the station of Manley.

We recommend an affirmance of the judgment of the district court.

EPPERSON and GOOD, CC., concur.

By the Court: For the reasons above given, the judgment of the district court is

AFFIRMED.