STATE OF NEBRASKA V. PACIFIC EXPRESS COMPANY.

FILED MARCH 5, 1908.   No. 15,307.

1. Statutes: EMERGENCY CLAUSE. An act which merely provides "this act shall take effect on and after its passage and approval" does not "express an emergency," under the requirements of section 24, art. III. of the constitution, and does not take effect until three months after the adjournment of the legislative session.

2. Carriers: STATE CONTROL. Express companies operating over the lines of railroad corporations exercising a public franchise in this state are equally subject to state control and regulation with the railroad companies over whose lines they operate, within the limited field of the business of transportation which they occupy.

3. ———: UNLAWFUL RATES: INJUNCTION. The attorney general may, on behalf of the state, maintain an action in equity to enjoin common carriers whose rates are fixed by law from violating the terms of the statute and exacting unlawful and excessive rates and charges.

4. Supreme Court: JURISDICTION: ACTION BY STATE. The jurisdiction conferred upon this court by the constitution "in all civil cases in which the state shall be a party" is not confined to cases in which the state has a mere pecuniary interest, but may extend to all cases in which the state, through its proper officers, seeks the enforcement of public right or the restraint of public wrong.

5. ———: ———: PUBLIC WRONGS: INJUNCTION. A wrong of a nature which affects the rights and interests of people living in almost every city, town and village in the state, as well as persons living in the country, when committed by a public service corporation, is a public wrong. An action to restrain such a wrong by the state is within the jurisdiction of this court.

6. Carriers: RATES. Until otherwise prescribed by competent authority, by the provisions of sections 2, 3, ch. 92, laws 1907, express companies doing business in this state after the law took effect may charge for the transportation of merchandise within

this state any sum not exceeding 75 per cent. of the rate in force on the 1st day of January, 1907, and 30 days were allowed after the act was in force for such companies to file with the state railway commission the schedule of rates and classifications in force on that date.

ORIGINAL action by the state to enjoin defendant from putting into effect charges or rates other than those established by law. Defendant filed plea in abatement. *Overruled.*

*W. T. Thompson, Attorney General, Grant G. Martin* and *Halleck F. Rose,* for the state.

*Charles J. Greene* and *Ralph W. Breckenridge, contra.*

LETTON, J.

On July 5, 1907, the attorney general filed in the name of the state of Nebraska petitions against the Adams Express Company, and four other express companies doing business in this state, alleging in substance: That the defendants are common carriers engaged in carrying on an express business over various lines of railroad in the state of Nebraska; that the legislature of 1907 passed the following act (laws 1907, ch. 91), known as "Senate File No. 355":

"An Act to provide for the filing of schedules of rates charged by express companies for the transportation of money or merchandise within the state of Nebraska; to fix a maximum charge for such service; to provide for the enforcement of the provisions of. this act; and for penalties for failure to comply with its provisions.

"*Be it Enacted by the Legislature of the State of Nebraska:*

"Section 1. (Express company Defined.)   All persons, associations or corporations engaged in the transportation of money or merchandise for a money consideration in cars other than freight cars and on trains other than

freight trains shall be deemed an express company within the meaning of this act.

"Section 2. (Schedule of Rates.) Within thirty days after the passage and approval of this act, all express companies doing business in this state shall file with the railway commission a complete schedule of the rates and classifications charged for the transportation of money or merchandise within this state by such company, which was in force on the first day of January, A. D. 1907.

"Section 3. (Rates.) Express companies may charge and receive for the transportation of merchandise within the state of Nebraska any sum not exceeding seventy-five per cent. of the rate as shown in the schedule provided for in section 2 of this act until after the state railway commission shall have provided a greater rate.

"Section 4. (Same, Minimum.) Provided that nothing in this act shall be construed to change the prepaid rates on merchandise weighing one (1) pound or less; and provided, further, that no provision of this act shall reduce any special contract rate in force for the transportation of cream, milk or poultry or any charge to a sum less than fifteen cents; and provided, further, that nothing in this act shall abridge the authority of the railroad commission to make a reduction in any rate provided for in this act.

"Section 5. (Violation of act.) If any express company should fail to comply with the provision and conditions of this act, they shall be fined on conviction a sum not less than ten dollars or more than one thousand for each offense.

"Section 6. (Enforcement of Act.) The Nebraska state railway commission, and if there be no commission, then the governor with the assistance of the attorney general, are hereby empowered to enforce the provisions of this act.

"Section 7. (Emergency.) This act shall take effect on and after its passage and approval.

"Approved April 5, 1907."

That it is the duty of the defendant to obey the statute and put in force the rates fixed by the legislature in said act, but that the defendant has put in force unlawful charges and rates for intrastate transportation of merchandise within the state of Nebraska, and is exacting from the people of the state of Nebraska unlawful, exorbitant and unconscionable rates and charges; that individual citizens who are interested are unable to cope with the defendant, and that it is the duty of the state to protect the people from the unlawful, exorbitant rates and charges exacted by the defendant. The prayer is for an injunction to prevent the defendant from making or putting into effect any other or different charges from those prescribed in the act, or from interfering with or attempting to change the rates and charges established by law for its services.

An answer was filed, which contained, among other things, an allegation that the law was not effective on July 5, 1907, on account of not having been passed with an emergency clause. The attorney general filed a motion to strike this part of the answer, on the ground that, under the provisions of section 7 of the act, which provides: "This act shall take effect on and after its passage and approval"—the act took effect as soon as passed and approved by the governor upon April 5, 1907. The motion to strike was overruled, the court being of the opinion that the act failed to comply with that part of section 24, art. III of the constitution, which provides: "No act shall take effect until three calendar months after the adjournment of the session at which it passed, unless in case of emergency, to be expressed in the preamble or body of the act, the legislature shall, by a vote of two-thirds of all the members elected to each house, otherwise direct"—and that the act, therefore, did not take effect until three calendar months after the adjournment of the session. By consent this answer of the defendant company has been withdrawn, and an answer in the nature of a plea in abatement has been filed, in order to present

certain preliminary questions which, if the contention of the defendant is upheld, would abate the action. In substance it is pleaded that the state of Nebraska has no power or authority under the constitution and laws of the state to maintain the action; that the supreme court has no jurisdiction; that the petition does not show whether the defendant is a person, association, or corporation; that the rates charged at the time the suits were begun were those in force prior to the 1st day of January, 1907, and that the rates provided for in the act were not in force and effect at the commencement of the present suit, and that the defendant was under no duty under the terms of the act to charge the rates therein provided for.

1. For convenience, we will consider the first and second points together. The defendant asserts that the state of Nebraska has no power. or authority under the constitution and laws of this state to maintain the suit, and that this court has no jurisdiction; while the attorney general maintains that the state may maintain a suit in equity in this court to protect the general welfare by protecting the public from oppressions, extortions and other injuries, though the state of Nebraska has no pecuniary or property interests in the suit. Section 22, art. VI of the constitution, provides: "The state may sue and be sued, and the legislature shall provide by law in what manner and in what courts suits shall be brought" —and section 2, art. VI, relating to the supreme court, provides: "It shall have original jurisdiction in cases relating to the revenue, civil cases in which the state shall be a party, mandamus, quo warranto, habeas corpus, and such appellate jurisdiction as may be provided by law." Referring to that clause of section 22, *supra*, which provides that "the legislature shall provide by law in what manner and in what courts suits shall be brought," it was held in *State v. Moores*, 56 Neb. 1, and, also, in *In re Petition of Attorney General*, 40 Neb. 402, that, even though the provisions of section 2 may not be self-executing, still that they have already been sufficiently

supplemented by legislation, so that the legislature has actually provided by law in what manner suits by the state should be brought, as required by section 22, art. VI.

But it is contended that the state is not properly a party in this case, and it is argued that no suit can be instituted by the state in the exercise of its constitutional powers or "sovereign capacity," except such suit is expressly provided for by statute; that the act in question has by its terms imposed upon the executive department the duty of its enforcement, and that it is therefore beyond the power of the attorney general to shift the burden of executing the law from the executive to the judicial department; that section 6 of the act provides: "The Nebraska state railway commission, and if there be no commission, then the governor with the assistance of the attorney general, are hereby empowered to enforce the provisions of this act"—and therefore that the railway commission is the only body vested with authority to enforce the provisions of the act. It is to be noticed, however, that no powers are conferred upon the railway commission by the statute with respect to the enforcement of the law other or greater than those given to private individuals. There is no procedure specified by which that body may act directly on the offending carrier. The railway commission, if it seeks to enforce the law, must travel the same road as any private citizen—appeal to the courts for relief, or for the punishment of the carrier who violates the law.

The main question presented by defendant's argument is whether the state of Nebraska, in behalf of its citizens concerned with the transportation of merchandise, may apply to this court in an original suit in which it has no pecuniary interest for relief from unjust exactions and extortionate charges made by express companies engaged as common carriers within the state. It is alleged in the petition that the defendant is carrying on its business over various lines of railroad in the state of Nebraska for hire,

and is continually transporting money and merchandise for a money consideration in cars other than freight cars and on trains other than freight trains between stations and between towns and places in the state of Nebraska. The defendant, then, is a public service corporation engaged in transacting business for the public over the public highways of the state of Nebraska. The railroad companies over whose lines of railroad its business is transacted have had conferred upon them a certain portion of the sovereignty of the state of Nebraska—the right of eminent domain—so that they might exercise it for public purposes. Such railway companies may carry on in their own corporate capacity the carriage of goods and chattels, money, merchandise, or any other articles which are susceptible of carriage by railroad transportation, or they may permit subordinate agencies, either personal or corporate, to engage in the transportation of money or merchandise over their lines under special care and in a more expeditious manner than if carried upon ordinary freight trains. The rights, the liabilities and the duties of the defendant, therefore, as a common carrier are measured by the rights, liabilities and duties of the railroad company over whose lines it operates and within the boundaries of the limited field of transportation within which the express company carries on its energies. The express company cannot be held liable for any violation of the duties of the original carrier in a department or sphere with which it is not concerned in the conduct of its business; but, within the limited scope of the field of transportation which is now occupied exclusively by express companies, their relation to the public as common carriers is the same as that of the railroad company. The fountain cannot rise higher than its source, and the express company and the railroad company are both subject to state control and reasonable regulation. The right of regulation by the state of the business of common carriers, especially of those to whom has been granted the right of eminent domain, is beyond discussion. The doctrine has now become so well estab-

lished as to become one of the fundamentals of the law. *Wisconsin, M. & P. R. Co. v. Jacobson,* 179 U. S. 287; *Atlantic C. L. R. Co. v. North Carolina Corporation Commission,* 206 U. S. 1. The grant of the right of eminent domain implies the consideration that the tolls, rates and charges to be made to the public for the use of the railroad shall be just and reasonable, and not extortionate, and that no unjust discrimination shall be made. The power and authority which granted the franchise to the railroad company to become a corporation, and to exercise the right of eminent domain and take private property for public use, even against the will of the owner, is the same power which is exercised to promote the public safety by requiring the lines to be fenced, road crossings to be made, and cattle guards constructed, which regulates the transportation of live stock, and prohibits the exaction of unreasonable and exorbitant charges for the carrying of passengers and freight. In granting the franchises the state did not surrender or abdicate its sovereignty, nor set in operation a power or agency which it thereby lost the right to control. This idea was firmly planted in our constitution at its birth, and the courts have consistently preserved its benefits to the people of this state. *State v. Republican V. R. Co.,* 18 Neb. 512; *Chicago, B. & Q. R. Co. v. State,* 47 Neb. 549; *State v. Missouri P. R. Co.,* 81 Neb. 15.

The defendant says: "It is only permissible to the state, in any jurisdiction, even in the absence of constitutional or legislative authority, to litigate in its sovereign capacity cases involving the jeopardy of the public health or the public peace. No well considered case can be found holding the contrary." Elsewhere in the brief of counsel it concedes that the state may maintain actions in which it has a pecuniary interest. But we think the state has not thus abrogated its powers, or denied itself one of the most powerful agencies for the ascertainment of fact and the application of a remedy, if needed, in matters that affect the regulation and control of public fran-

chises.   A sufficient answer to this contention is found
in the following quotation from the opinion of Justice
Brewer in *In re Debs*, 158 U. S. 564, 39 L. ed. 1092:
"Every government, entrusted, by the very terms of its
being, with powers and duties to be exercised and dis-
charged for the general welfare, has a right to apply to
its own courts for any proper assistance in the exercise
of the one and the discharge of the other, and it is no
sufficient answer to its appeal to one of those courts that
it has no pecuniary interest in the matter.   The obliga-
tions which it is under to promote the interest of all,
and to prevent the wrongdoing of one resulting in injury
to the general welfare, is often of itself sufficient to give it
a standing in court."   In *Stockton v. Central R. Co.*, 50
N. J. Eq. 52, it is said: "The next inquiry is, whether
the attorney general may invoke the power of this court
to restrain further operations under, and in pursuance
of, the lease.   It is well settled that, where a corporate
excess of power tends to the public injury or to defeat
public policy, it may be restrained in equity at his suit.
In *Attorney General v. Delaware & B. B. R. Co.*, 12 C. E.
Green (N. J.), 631, in pronouncing the opinion of the
court of errors and appeals, Mr. Justice Dixon said: "In
equity, as in the law court, the attorney general has the
right, in cases where the property of the sovereign or the
interests of the public are directly concerned, to institute
suit, by what may be called civil information, for their
protection.   The state is not left without redress in its
own courts because no private citizen chooses to encounter
the difficulty of defending it, but has appointed this high
public officer, on whom it has cast the responsibility and
to whom, therefore, it has given the right of appearing
in its behalf and invoking the judgment of the courts on
such questions of public moment."   Professor Pomeroy,
in his work on Equity Jurisprudence (3d ed.), sec. 1093,
states the rule in this language: "When the managing
body are doing or are about to do an *ultra vires* act of
such a nature as to produce *public* mischief, the attorney

general, as the representative of the public and of the government, may maintain an equitable suit for preventive relief. In *Trust Co. of Georgia v. State,* 109 Ga. 736, though the court held that under the facts the lower court erred in granting the injunction, it carefully reviewed the authorities, and said upon this point: "Our conclusion, therefore, both from reason and a decided weight of authority, is that the state, in her sovereign capacity, can appeal to the courts for relief by injunction, whenever either its property is involved, or public interests are threatened and jeopardized by any corporation, especially one of a public nature like a railroad company, seeking to transcend its powers, and to violate the public policy of the state." See, also, *Louisville & N. R. Co. v. Commonwealth,* 97 Ky. 675. In *Attorney General v. Jamaica Pond Aqueduct Corporation,* 133 Mass. 361, it was held by the supreme court of Massachusetts that an information in equity in the name of the attorney general will lie against a *quasi* public corporation doing and contemplating acts which are *ultra vires* and illegal, the necessary effects of which are to impair public rights. The case was decided on the point that the illegal acts created a public nuisance; but the court recognizes the principle that if the threatened act would injuriously affect or endanger the public interests the action will lie, citing a number of English cases to support the proposition. In *Attorney General v. Great Northern R. Co.,* 1 Drew. & Sm. (Eng.) 154, it was said by Vice Chancellor Kindersley: "The only remaining question is this: whether, if the interests of the public are injured or endangered by the practice complained of, it is competent for the attorney general, *ex officio* or on relation, to file an information to prevent it. On this point I entertain no doubt whatever. Wherever the interests of the public are damnified, by a company established for any particular purpose by act of Parliament, acting illegally and in contravention of the powers conferred upon it, I conceive it is the function and duty of the attorney general

to protect the interests of the public by an information; and that where, in the case of any injury to private interests, it would be competent for an individual to apply for an injunction to restrain a company from using its powers, for purposes not warranted by the act creating it, it is competent for the attorney general, in cases of injury to public interests from such a cause, to file an information for an injunction. The cases in which the attorney general comes forward on behalf of the public to ask this court to restrain a nuisance are an illustration of this principle. A nuisance may be detrimental to the public or to an individual; and it is very usual for the attorney general to come forward for an injunction to restrain it, so far as it affects the public, just as an individual may apply for an injunction to restrain it, where it affects himself. It is true that every injury is not a nuisance; but the right of the public to be protected against injury by the information of the attorney general is not confined to those injuries which come within the strict definition of a nuisance. Where it is the interest of the public to prevent an illegal act, such as this, being committed, it is competent for the attorney general to file an information to restrain it." The whole subject of the power of the state to maintain an action such as this in the supreme court of a state having similar constitutional provisions to those of this state is considered in a learned and exhaustive opinion by Chief Justice Ryan—which is one of the landmarks of modern jurisprudence—in *Attorney General v. Chicago & N. W. R. Co.,* 35 Wis. 425, and both the right of the state to maintain the action and the jurisdiction of the court to entertain it are clearly demonstrated. The subject is also discussed in Brice (Green), Ultra Vires, p. 706, where the authorities are collected. While there are cases announcing doctrines which may not be in entire harmony with these, we believe that, if for no other reason, the marvelous development of franchised public service corporations during the present generation

56

demands that of two opposing policies that one should be adopted which leaves the state most unfettered in its powers of regulation and control, and most free in adopting speedy and adequate means of safeguarding the public interest by direct action, if necessary, in the court of last resort.

But it is said that under the terms of the act the state railway commission, and not the attorney general, has been designated as the officer to enforce the law, and that the attorney general is not authorized to maintain the suit. The petition recites, however: "Comes now the state of Nebraska, by its attorney general, William T. Thompson, *by and with the consent and authority of* \* \* \* *the Nebraska state railway commission, and for cause of action,"* etc. This allegation is not denied, and must be taken as true. It therefore appears that the action is brought by the attorney general, by the authority of the Nebraska state railway commission, the particular officers connected with the executive department of the state government who are specially empowered by the act itself to enforce its provisions. It may be said, further, that under the provisions of the statute specifying the power and duties of the attorney general it is the duty of the attorney general to appear for the state and prosecute all actions in the supreme court in which the state shall be interested or a party, and he may on his own motion bring and prosecute for the state any suit, matter or thing, civil or criminal, in which the state is interested, or relating to any matter connected with the executive department. Irrespective of what the powers of the attorney general might have been at common law, as the law officer of the crown, under this provision the power and the duty of determining when an action shall be brought by the state or in the interests of the state in this court devolves upon the attorney general as fully and to as great an extent as upon the governor or any other officer of the executive department. When, in the exercise of the powers thus conferred upon him by the constitution

and the law, the attorney general determines that the interests of the state require an action to be brought in this court, no question can arise as to his authority to institute or maintain the suit, if it is a matter in which the state is interested, or relating to the executive department.   If, in his judgment, there is good cause to believe that any public service corporation, the regulated and fixed charges of which for services rendered to the public under its franchise have been disregarded, or that unreasonable, extortionate and excessive charges have been made for public service, it becomes his duty as a member of the executive department of the state to institute proceedings before the judicial department of the government whereby the rights of the state, exercised in behalf of all the people, may be preserved and vindicated. This is a well-recognized power and duty of such an officer both in England and in this country.

We have no hesitation, therefore, in holding that, in all civil cases in which the existence or regulation or control of a public franchise, the grant of which carries with it any exercise of a portion of the sovereign power of the state, is concerned, this court has original jurisdiction at the suit of the state, or of the attorney general in behalf of the state.   To hold otherwise would be to divest the state of the most efficient manner of exercise of its regulatory and supervisory powers over the instrumentalities which it has created for its own public purposes, which we cannot believe it ever was the intention of the makers of the organic law to do.   In the opinion of Mr. Commissioner RYAN, in *In re Petition of Attorney General,* 40 Neb. 402, it was said: "Such jurisdiction will not be entertained by this court in cases wherein the state is but a nominal party.   The case must be such that the state, as a real, substantial party, has a direct interest in having determined."   But, as has been pointed out in a number of the opinions, portions of which are quoted herein, a public wrong may consist of almost innumerable instances of private wrong; and that is espe-

cially true if it is a wrong of a nature which affects the rights of the people living in almost every city, town or village in the state as well as those living upon farms and ranches. The express companies now rival the post office in the extent of their operations, and possibly actually transact business for as many or more different persons in the course of a year than the railroad companies do. We think, therefore, that in cases such as this, where the people of the whole state are interested in the charges made for carriage upon public highways by common carriers, the state has a real and substantial interest, and the jurisdiction of this court is undoubted.

2. The objection that the petition does not show whether the defendant is a person, association or corporation probably should have been made by motion to make more specific. At all events, we think it is too late in the progress of this case to raise it now.

3. As to the contention that the suit was prematurely brought, sections 2 and 3 (laws 1907, ch. 91) of the act are as follows: "Section 2. (Schedules of Rates.) Within thirty days after the passage and approval of this act, all express companies doing business in this state shall file with the railway commission a complete schedule of the rates and classifications charged for the transportation of money or merchandise within this state by such company, which was in force on the first day of January, A. D. 1907.

"Section 3. (Rates.) Express companies may charge and receive for the transportation of merchandise within the state of Nebraska any sum not exceeding seventy-five per cent. of the rate as shown in the schedule provided for in section 2 of this act until after the state railway commission shall have provided a greater rate."

The defendant's contention is that the direction that an express company shall file a schedule of rates in force January 1, 1907, "within thirty days after the passage and approval of this act" must be construed as meaning within 30 days after the act becomes a law, and that the

act became a law on July 5; that the legislature intended the companies to have 30 days within which to prepare schedules after the law became effective, and that the rates provided for did not go into effect until 30 days after the filing of the schedules. It is our view that the legislature intended to adopt, and did adopt, the rates and classifications charged for the transportation of money or merchandise on the 1st day of January, 1907, as a basis or standard of comparison for the new rates, and that under the provisions of section 3 of the act it became unlawful, after the act took effect, for an express company to charge or receive for its services in this state any greater sum than 75 per cent. of the rate in force upon January 1, 1907. It cannot be reasonably contended that it was the intention of the legislature that the rates set forth in the written schedule filed should be taken as the basis, or as anything more than evidence of the rate which was actually charged on January 1. If, by mistake, the schedule filed showed a rate other than that actually charged, it would be unreasonable to say that a rate "as shown by the schedule" should be taken as the basis, as a narrow and literal reading of the act would require, and not the rate which was actually charged and in force on the 1st day of January, 1907.

We are of the opinion that the true interpretation of the meaning of the act is that a rate not exceeding 75 per cent. of the rates charged on the 1st of January, 1907, became the lawful rate as soon as the act took effect, but that 30 days thereafter were allowed the express companies to file with the railway commission a complete schedule of the rates and classifications in force on January 1, 1907. To so interpret the act places no harsh or unreasonable burden upon the express companies, by way of requiring new schedules and classifications to be made within such a short period of time as to necessitate undue haste in preparation, or such as to require the employment of extra assistance before the rates could easily be ascertained, since the only process necessary for their agents

to perform in order to ascertain the lawful rate after the act took effect was to deduct 25 per cent. from the rates in force upon January 1, 1907. But, recognizing the difficulty and the necessary time required to prepare new written or printed schedules of rates and classifications of the multifarious articles of merchandise carried by express, the legislature wisely provided the space of 30 days in which to prepare and file such schedules before a penalty for noncompliance with this direction should be imposed. As soon as the act became operative, the rates prescribed took effect, but the time to file the schedules extended for 30 days thereafter. The action, therefore, was not prematurely brought.

We conclude, therefore, that the attorney general had authority to bring the suit in the name of the state, that this court has jurisdiction, and that the action was not premature.

The plea in abatement is therefore

OVERRULED.