WAR FINANCE CORPORATION ET AL., APPELLANTS, V. HENRY M. THORNTON ET AL., APPELLEES.

FILED JULY 19, 1929. No. 26645.

*Morrow & Morrow* and *Kennedy, Holland, De Lacy & McLaughlin,* for appellants.

*William H. Heiss, Jr., contra.*

Heard before GOSS, C. J., DEAN, GOOD, EBERLY and DAY, JJ., and REDICK and SHEPHERD, District Judges.

GOOD, J.

This is an action for the foreclosure of a real estate mortgage. The defense of usury was interposed and sustained. Decree was entered for plaintiffs for the balance due on the principal of the notes secured by the mortgage. Plaintiffs have appealed.

The notes provided for interest from their date at 10 per cent. per annum, being the maximum legal rate, and the mortgage contained a clause which required the mortgagors to pay, in addition to the interest, all taxes and assessments levied upon the real estate and all other assessments levied upon the mortgage, or the note which the mortgage was given to secure.

In *Stuart v. Durland*, 115 Neb. 211, this court held: "A mortgage which, by its express terms, requires the mortgagor to pay the maximum legal rate of interest on the debt which it secures, and, in addition, to pay the taxes upon the mortgagee's interest in the mortgaged premises, is usurious." The above holding was by this court reaffirmed in *Quesner v. Novotny*, 116 Neb. 84; *Dwyer v. Weyant*, 116 Neb. 485; and *Dawson County State Bank v. Temple*, 116 Neb. 727.

To avoid the effect of these decisions, plaintiffs cite and rely upon section 5952, Comp. St. 1922, as amended by chapter 178, Laws 1927. The title of the latter act is: "An Act to amend section 5952, Compiled Statutes of Nebraska for 1922, relating to revenue, to declare an emergency and to repeal said original section." The original section 5952 of the Compiled Statutes was a part of the revenue law which provides for the assessment of real estate and real estate mortgages, and requiring the interest of the mortgagee in the mortgaged premises to be separately assessed, and also contained the following provision: "When any mortgage contains a condition that the mortgagor shall pay the tax levied upon the mortgage or the debt secured thereby, the mortgage shall not be entered for separate assessment and taxation, but both interests shall be assessed and taxed to the mortgagor or owner of the real estate. An

agreement of this character in the mortgage shall not destroy the negotiability of any note secured thereby. The value of the real estate in excess of any mortgage taxable to and taxed to the mortgagee shall be assessed and taxed to the mortgagor or owner." The only change made in this statute by the amendment of 1927 was to add immediately after the words, "negotiability of any note secured thereby," the following five words: "nor render such note usurious."

Notwithstanding the usury statute (Comp. St. 1922, sec. 2838) provides that if a greater rate of interest than that allowed by law shall be contracted for or received or reserved, plaintiff shall recover only the principal without interest and defendant shall recover his costs, and if the interest shall have been paid, judgment shall be for the principal, deducting the interest, plaintiffs in the instant case contend that section 5952, Comp. St. 1922, as amended, has the effect of destroying the defense of usury, in so far as it relates to obligations secured by real estate mortgages containing the tax clause above quoted, and that the amended statute is applicable to preexisting contracts, as well as to those made subsequent to its enactment.

Defendants contend that in the enactment of chapter 178, Laws 1927, a number of constitutional provisions were violated, and for that reason said chapter is void and can afford no relief to plaintiffs in this action.

It is a well-settled rule that courts will not determine the constitutionality of legislative acts unless such determination is necessary to a proper disposition of the cause before the court. In *Morse v. City of Omaha*, 67 Neb. 426, it is held: "The appellate court will not pronounce a statute unconstitutional and void where a determination of the case does not require that the constitutionality of the statute be determined." In *State v. Fulton, ante* p. 400, it is held: "This court will refuse to pass upon the constitutionality of a statute unless it is necessary to a proper disposition of an action pending in this court."

In 12 C. J. 780, sec. 212, it is said: "It is a well-settled

principle that the constitutionality of a statute will not be determined in any case, unless such determination is absolutely necessary in order to determine the merits of the suit in which the constitutionality of such statute has been drawn in question." The reasons given for the rule are stated in *Ex parte Randolph,* 20 Fed. Cas. 242, No. 11558, in the following languages: "The decision of a question involving the constitutionality of an act of congress is one of the gravest and most delicate of the judicial functions, and while the court will meet the question with firmness, where its decision is indispensable, it is the part of wisdom, and a just respect for the legislature renders it proper, to waive it, if the case in which it arises can be decided on other points." In *Hoover v. Wood,* 9 Ind. 286, the reason for the rule is stated as follows: "While courts cannot shun the discussion of constitutional questions when fairly presented, they will not go out of their way to find such topics. They will not seek to draw in such weighty matters collaterally, nor on trivial occasions. It is both more proper and more respectful to a coordinate department, to discuss constitutional questions only where that is the very *lis mota.*" It follows that, if the instant case may be properly decided upon other questions than the constitutionality of the statute, the latter question will not be considered.

A well-recognized rule of statutory construction, and one firmly established in this jurisdiction, is that a statute will be held to operate prospectively and not retrospectively unless the legislative intent or purpose that it should operate retrospectively is clearly disclosed. The following are some of the decisions of this court supporting the rule announced: *Blunk Bros. v. Kelley,* 9 Neb. 441; *State v. City of Kearney,* 49 Neb. 337; *McIntosh v. Johnson,* 51 Neb. 33; *Commercial Bank of St. Louis v. Eastern Banking Co.,* 51 Neb. 766; *Adair v. Miller,* 109 Neb. 295; *State v. Federated Merchants Mutual Ins. Co.,* 117 Neb. 98.

After a careful examination of chapter 178, Laws 1927, we discover nothing to indicate an intent of the legislature that said act should operate other than prospectively. It

follows that if said chapter 178 is valid, which we do not determine, it can operate only prospectively. Since the contracts involved in this action were executed long prior to the passage of chapter 178, it cannot operate to determine whether said contracts are usurious. The decision of this case, therefore, is governed by the rule announced in *Stuart v. Durland, supra,* and the cases reaffirming the doctrine therein announced.

The judgment of the district court is in conformity with the decisions of this court, and is

AFFIRMED.

EBERLY, J., dissenting.

I am unable to agree with the reasons assigned in the majority opinion and dissent from the affirmance of the judgment of the district court pursuant thereto.

In stating this conclusion, as well as in the further observations I shall make, I do so with a just appreciation of the pronouncement to which I except, and the favorable consideration which the undoubted learning of its author, as well as the well-founded reputations of each and all who supported it at its adoption by this court, entitle it to receive. In this spirit, in support of my views, I submit the following for the consideration of this court:

It must be conceded that chapter 178, Laws 1927, under consideration, is not an act complete within itself. We must consider then this chapter for what it actually is, as a part of complete legislative action. The effect of this law of 1927, it must be admitted, was then to amend a single section of a statute comprising a number of sections. If this be true, it seems that the well-settled rule of construction to be applied, to determine the force and effect of the language used, is that all parts of this legislation, of which chapter 178 formed only a part, should be considered together, and not each section by itself. 2 Lewis' Sutherland, Statutory Construction (2d ed.) 659, par. 344. This rule the majority apparently ignore.

It would also seem, in obedience to the many precedents the history of this court discloses, that if we should, on

investigation, determine that the act as an entirety, of which chapter 178 appears as an amendment, possesses the characteristics of what is commonly known as a remedial statute, our investigation would necessarily include, in addition to the complete act of which the amendment under consideration forms only a part, also all laws existing prior thereto relating to the subject-matter, as well as the mischief to be corrected and the remedy to be applied. *Clother v. Maher*, 15 Neb. 1; *Harmon v. City of Omaha*, 17 Neb. 548; *Swearingen v. Roberts*, 12 Neb. 333.

It may also be observed that there is apparently no issue between the members of this court on the question that—"It is clearly within the competence of the legislature to ordain that an amending act shall have a retrospective operation, saving contracts and vested rights in so far as they are protected by the Constitution; and when this intention is explicitly stated or deducible by necessary inference from the terms of the statutes, the courts must give effect to it." *Perry v. Denver*, 27 Colo. 93; *Iowa Savings & Loan Ass'n v. Heidt*, 107 Ia. 297; *Lew v. Bray*, 81 Conn. 213.

Indeed, the rule as stated in the majority opinion implies this conclusion and at least two of the Nebraska cases cited in support thereof proceed on the theory that this right is unquestioned. It follows, therefore, that the controlling question in this case as presented in the majority opinion is not one of legislative power, but what has been actually done by the legislature.

As to the law as it was, and as to the events, and the situation that preceded the original enactment of the legislation now under consideration, it is to be remembered, and the court will take judicial notice of the fact, that prior to 1911 the method by taxation of real estate mortgages in Nebraska then in vogue was by the best minds of our state regarded as highly unsatisfactory. At that time land mortgaged was assessed to the owner thereof without any deduction because of existing liens. The mortgagee thereof, so long as he remained the owner of the mortgage, if a resi-

dent of the state, was also presumably taxed on the full value thereof. On this basis the universal complaint was that of double taxation, all of which the debtor ultimately paid, for the landowner debtor discovered that he was not only required to pay his land tax direct, but that in fact, though not in name, he was also required to pay the tax assessed on his mortgage debt held by his creditors, in the enhanced rate exacted as interest on his loan. The mortgagees, it seems, likewise had troubles with the tax assessor. The state itself was dissatisfied with tax conditions.

To avoid the effects of this situation, there was introduced as a custom of the financial market, the device of incorporating an agreement or condition in the mortgages whereby it was agreed on behalf of the mortgagor that he should and would "pay all taxes and assessments levied upon said (mortgage) premises and all taxes and assessments levied upon the holder of the mortgage for, or on account of, the same." This afforded a measure of relief to the mortgagees, but none whatever to the landowner. It did make his payments patent where, before, the fact was in a measure concealed. However, when this court, in the cases of *Garnett v. Meyers*, 65 Neb. 287, *Consterdine v. Moore*, 65 Neb. 296, and *Allen v. Dunn*, 71 Neb. 831, announced and established the rule that the agreement, or condition, in question inserted in the mortgage, under the laws of this state, operated to destroy the negotiability of the note secured thereby, even that measure of relief was valueless. A non-negotiable note and mortgage is admittedly not a desirable investment in the money markets where such property is bought and sold. To the *bona fide* purchaser thereof there is ever present the shadow of litigation based upon unknown facts that might have entered into the transactions between the immediate parties to the instrument. So it was rediscovered that increased risk has always been reflected in enhanced interest rates. Truly, in view of the course of events that transpired in the commercial life of the state, it could be well said of the debtor, after the developments mentioned, "the last state of that man was worse than the first."

Such, indeed, was the "mischief" that appealed to the legislature of 1911 "for remedy." Their answer was the enactment of chapter 105, Laws 1911. It was entitled "An act to provide for the taxation of mortgages of real property and to prevent double taxation on incumbered property in the state." It consisted of six sections: The first embraced the definition of terms employed in the act. The second declared mortgages of real estate to be an interest in real estate for the purpose of assessment and taxation; provided for the manner of assessment thereof when such mortgage contained no agreement or condition that the taxes assessed should and would be paid by mortgagor; regulated the rights of the parties to this transaction in such a manner as to avoid what has been considered as double taxation. The third section was devoted to the duties of assessing officers; recognized, provided for and validated agreements between mortgagors and mortgagees; that the taxes on the mortgage debt, the mortgage and the real estate should be paid by the mortgagor; and "provided further that such agreement contained in the mortgage will not destroy the negotiability of any note secured thereby." The fourth section provided a method whereby the public record would at all times disclose the actual amount unpaid of the mortgage indebtedness. The fifth and sixth sections were as follows:

"Section 5. This act shall apply to all mortgages filed on and after July 1, 1911. Mortgages on lands in this state filed on and after said date shall not be taxed in any other manner than herein provided. All mortgages on real estate recorded prior to July 1, 1911, shall be taxable as provided by law under provision of law relating thereto, prior to the enactment hereof: Provided that this act shall not apply to corporations, the property of which is now exempt from taxation.

"Section 6. This act shall take effect and be in force on and after its passage and approval according to law.

"Approved April 3d, 1911."

As preliminary to the discussions of the amendatory

effect of chapter 178, Laws 1927, it is to be noted that the peculiar nature and purpose of the legislation of 1911 and of its integral character was recognized and expressed by the codification and compilation of 1913. It here becomes article V, ch. 69, entitled "Revenue." Its chapter sections are numbered as 61-65, inclusive, and in addition for convenience assigned general numbers 6349-6353; but, as evidencing full recognition of this act as legislation complete within itself and made up of interrelated parts, we find these compilers have substituted for the words "this act" (chapter 105, Laws 1911) the words "this article" (article V, ch. 69), almost the same feature characterizing the words of the compilers and revisers of the Compiled Statutes of 1922, wherein chapter 105, Laws 1911, appears as "article XIV, ch. 61," and here again, for convenience only, the sections thereof are numbered 5950-5954, but the unity of the chapter continues to be evidenced by the words "this article (article XIV, ch. 61) shall apply to all mortgages filed on or after July 1, 1911." It would seem beyond dispute that the numbering of the sections under consideration, or the incorporation of the act of 1911 into the subsequent revisions of the statutes as an "article" therein, in no manner affects the scope and interpretation of the act or of the constituent parts thereof.

Preliminary to a discussion of this legislation, it would seem of fundamental importance in this case that the following should be kept in mind: "The act is complete within itself," and, fairly considered, constitutes "original and independent legislation." It is not and cannot be inimical to the provisions of section 14, art. III of the Constitution, and where such an act is repugnant to, or in conflict with, a prior law which is not referred to, nor in express terms repealed by the later act, the earlier statute is repealed by implication. *State v. Hevelone,* 92 Neb. 748; *State v. Ure,* 91 Neb. 31.

This act also relates wholly to the exercise of the sovereign power of the state and rights incident thereto, arising therefrom, or connected therewith. It is to be remembered

that state constitutions are not a grant, but a limitation of the legislative power, that the legislature has plenary power of legislation and may pass any law not forbidden by the Constitution of the state or the United States. Every subject not withdrawn from this authority may be acted on by that body. The sovereign right to tax may not be denied. The existence of the state is dependent on it. Implied therein is the lawful discretion to adopt, prescribe and approve reasonable methods and devices to secure the just exercise of this undoubted power, in a manner which, while efficient to secure the beneficiary the just fruits of lawful exactions, will at the same time operate, not only to conserve the well-being of the state and the resources from which its revenues must be derived, but also to accord full and complete protection to persons and property taxed from all unnecessary injury, loss or damage which might otherwise incidentally ensue not only as between sovereign and subject, but as between subject and subject, due to, or connected with, or arising out of compliance with the mandate of the taxing power. This deduction is involved in the presumption that—"It must have been the intention of those who gave these powers, to insure, as far as human prudence could insure, their beneficial execution. * * * That a power to create implies a power to preserve. * * * The sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission." *McCulloch v. State of Maryland,* 4 Wheat. (U. S.) *316. Indeed, to judicially approve and permit to coexist a private corporation chartered solely for private gain, created by an act of legislature complete within itself, and lawfully endowed thereby with the power to charge and privileged to exact a compensation for money loaned at variance with the general law (*Livingston Loan & Building Ass'n v. Drummond,* 49 Neb. 200; *Anselme v. American Savings & Loan Ass'n,* 66 Neb. 520), and at the same time judicially deny to the sovereignty (the sole creator of this corporate entity first discussed) the same right, in its own behalf, in the accomplishment of a public purpose, and in promotion of public

good, in the same manner, to confer and exercise upon, through and by its own fiscal creations and devices of taxation the same or similar power and the same or similar privileges when constitutional limitations are not thereby infringed, would involve a judicial solecism unworthy of this court. And so, pursuant to the sovereign powers of state, there was incorporated in this act among the safeguards contained therein an agreement of this kind shall "not destroy the negotiability of any note," etc., and later to which was added, by amendment of 1927, "nor render such note usurious."

The ancient maxim, "The king can do no wrong," has no place in American jurisprudence. But the fair deduction therefrom that the sovereign intends no wrong and wills no unnecessary injury is a principle which applies to the modern state, and in the light of which its statutes are to be read. This statute so enacted, in view of its terms, and the history preceding it, is plainly remedial in nature; not only remedial, but it evidences the efforts of a sovereignty to correct an unintended wrong or injury incidental to the then operations of its taxing law. The court therefore is warranted in giving it a liberal and effective construction under the peculiar circumstances in this case and it should not be strictly construed. *Buckmaster v. McElroy,* 20 Neb. 557; *McIntosh v. Johnson,* 51 Neb. 33; *Omaha Savings Bank v. Rosewater,* 1 Neb. (Unof.) 723. In conforming to the rules of construction heretofore set forth, the several parts of this act are to be construed together in order to ascertain the intention of the legislature. *Follmer v. Nuckolls County,* 6 Neb. 204; *City of Lincoln v. Janesch,* 63 Neb. 707. The court will give this act the meaning which it is apparent from the language used that the legislature had in mind when the act was passed. *State v. Hanson,* 80 Neb. 738.

Applying the principles just enumerated, it is to be seen that sections 5 and 6, ch. 105, Laws 1911, above referred to, are important evidence of legislative intention in relation to the act before us. It will be noted there is an absence of an

emergency clause. The sixth section does not express an emergency. *State v. Pacific Express Co.* 80 Neb. 823. This act, containing no emergency clause, did not become operative under the terms of the Constitution until three calendar months from and after the adjournment of the legislature of 1911. As the time of adjournment of the legislative bodies is a fact which the courts of this state are required to take judicial cognizance of, we judicially know that it took place on April 6, 1911. Chapter 105, Laws 1911, therefore first became constitutionally in effect July 7, 1911, and speaks and operates from the beginning of that date. 1 Lewis' Sutherland, Statutory Construction (2d ed.) 313, par. 175. While this legislation was wholly without power of speech or of command until July 7, 1911, yet the legislative mandate contained in the sixth section thereof expressly required that the provisions of the act as an entirety, as well as each of the component parts thereof, should be applied to "all mortgages filed on and after July 1, 1911." It is also true that under the express terms of the statute, as well as by necessary implication, its provisions were applicable to all mortgages filed on and after July 1, 1911, without reference to the date of execution or the time of the transaction evidenced thereby. As to all mortgages filed from July 1 to July 6, 1911, inclusive, its operation must be deemed wholly retroactive. Likewise, this is true as to mortgages filed on or after July 1, 1911, bearing dates or evidencing transactions consummated prior to July 1, 1911. Indeed, under the terms of this statute, prior to amendment, a mortgage executed forty years ago, but filed for record today, would be within its express terms and subject to the operation of its provisions.

In view of these facts, as well as the language of chapter 105, Laws 1911, construed as an entirety, with due regard to the principles of statutory construction already discussed, the conclusion is inescapable that this chapter evidenced a clear and unmistakable expression in precise terms, as well as by necessary, inevitable implication, of a plain, positive, legislative purpose and intent, at the very

time of its enactment, that all of its provisions were and are retroactive in effect and were and are to be given retrospective operation; that this intent was not only explicitly stated, but is deducible by necessary inference from the terms of the statute itself, and that the courts of this state are bound to give effect to it.

Heretofore the interpretation of this legislation by this court has been consistent with the conclusion just expressed. This act as amended by chapter 138, Laws 1919, "An act to amend sections 6350 and 6351, Revised Statutes of Nebraska for 1913," was sustained as involving the sovereign power of taxation, as retroactive in effect, and the claim that it impaired the obligation of contract and destroyed vested rights was expressly denied. *State v. Rowe,* 108 Neb. 232. In *Peterson v. Kuhn,* 110 Neb. 372, a portion of section 5952, Comp. St. 1922, validating agreements between mortgagors and mortgagees as to all payments of taxes, and particularly that portion of the same providing an agreement of this kind shall "not destroy the negotiability of any note secured thereby," was sustained by a unanimous court, and the clause quoted held to be valid and effective. It is to be noted that the only change effected by the amendment of 1927 adds to the sentence just quoted, and which this court then sustained, the words "nor render such note usurious."

This court is committed to the doctrine "that the simultaneous repeal and reenactment of a statute in terms, or in substance, is a mere reaffirmance of the original act and not a repeal in the strict or constitutional sense of the term." The original legislation reaffirmed by the amendatory act of 1919 and of 1927 thus remains in full force and effect without interruption or change in legal interpretation. *State v. Bemis,* 45 Neb. 724; *Stenberg v. State,* 50 Neb. 127; *Quick v. Modern Woodmen of America,* 91 Neb. 106; *Mulhollan v. Scoggin,* 8 Neb. 202; *Gooch Milling & Elevator Co. v. Chicago, B. & Q. R. Co.,* 109 Neb. 693.

Even if it be conceded in principle that amendments to a section might, as to interrelated parts of that act, of

which the section amended forms a part, operate to repeal by implication, the principle has no application to the amendment of 1927. Repeals by implication are not favored and only occur where there is an unmistakable repugnancy between the later and the earlier act. None exists here. Indeed, to construe "nor render such note usurious" within the scope of the legislative mandate "shall apply to all mortgages filed on and after July 1st" is not only consistent with its legislative history, and the "mischief" its purpose was to remedy, but is imperatively required by the literal terms of the statute and strictly conforms to the public policy evidenced by the act.

The almost universal rule of construction applicable and controlling in the present situation, we find, appears in the history of American jurisprudence as announced in two leading cases, viz., *Farrell v. State*, 54 N. J. Law, 421, and *Conrad v. Nall*, 24 Mich. 275. In the New Jersey case the principle was stated as follows:

"The effect of an amendment of a section of the law is, not to sever it from its relation to other sections of the law, but to give it operation in its new form as if it had been so drawn originally, treating the whole act as an harmonious entirety, with its several sections and parts mutually acting on each other."

And the same rule was in substance announced in *Conrad v. Nall*, 24 Mich. 275. In that case the Michigan court said:

"The act of 1869 (Sess. L. 1869, p. 155) amending § 24, ch. 140, R. S. 1846 (Comp. L. § 5384), was not intended to operate independently of the other provision of the same chapter. The whole chapter in its present form is now to be read as one act, with its several parts and clauses mutually acting on each other as their sense requires."

In the case of *Blair v. Chicago*, 201 U. S. 400, Justice Day, after a comprehensive discussion of the authorities covering this question, frames the rule in the following form:

"As a rule of construction, a statute amended is to be understood in the same sense exactly as if it had read from

the beginning as it does amended." Approved in *Pennsylvania Co. v. United States,* 236 U. S. 351.

Our own court in full accord with the decided weight of authority announces the rule in the following form:

"The section of an act properly amended should be construed precisely as though it had been originally enacted in its amended form." *State v. Hevelone,* 92 Neb. 748.

So it fairly appears that to the authority of this rule there can be no contention; as to the result of its application in the present case, little doubt. Reading the controlling statute before us, as an entirety, together with the amendment of 1927, "precisely as though it had been originally enacted in its amended form," "with its several sections and parts mutually acting upon each other," the words of the amendment "nor cause such note to be usurious" inevitably and inescapably would apply to all mortgages filed on or after July 1, 1911, and would therefore necessarily apply to the contracts in suit here. It would likewise involve, we respectfully submit, an unconditional negation of the premises on which the majority decision is based, viz.: "We discover nothing to indicate an intent of the legislature that (this legislation) it should operate other than prospectively." If this is true, and the provision now construed is valid, it will operate retrospectively to cut off all defenses of usury for the future even in actions upon contracts previously made. *Gibson v. Sherman County,* 97 Neb. 79. In the *Gibson* case this court substantially without reservation quoted, approved, applied, and in applying adopted the doctrine on the subject of usury announced by the supreme court of the United States in *Ewell v. Daggs,* 108 U. S. 143. The following excerpt will disclose the tenor of our then decision:

"Independent of the nature of the forfeiture as a penalty (for usury), which is taken away by a repeal of the act, the more general and deeper principle on which they are to be supported is, that the right of a defendant to avoid his contract is given to him by statute, for purposes of its own, and not because it affects the merits of his obligation; and that

whatever the statute gives, under such circumstances, as long as it remains *in fieri*, and not realized by having passed into a completed transaction, may, by a subsequent statute, be taken away. It is a privilege that belongs to the remedy, and forms no element in the rights that inhere in the contract. The benefit which he has received as the consideration of the contract, which, contrary to law, he actually made, is just ground for imposing upon him, by subsequent legislation, the liability which he intended to incur. That principle has been repeatedly announced and acted upon by this court."

If this authority be finally adhered to, the judgment of the district court in this case must be reversed, with directions to enter decree in accordance with plaintiffs' petition. On the other hand, if the principles announced in the case be disapproved and the contention of appellees on these points be accepted by the majority, the result will be to approve the decree entered in the district court. But at least the merits of the case should be determined and the parties to mortgages advised as to their rights and the state notified as to the actual condition of this potential source of revenue, for, though not a technical party to this litigation, it will nevertheless be affected by the results.

To determine the validity of the provision we have discussed, "nor render such note usurious," I conceive to be an imperative duty imposed by the record on this court, and because of the failure of the majority so to do, I am constrained to dissent.